*In re* PAT BRAZELTON, Asserted to be a Person Subject to Administration of Psychotropic Medication (The People of the State of Illinois, Petitioner-Appellee, v. Pat Brazelton, Respondent-Appellant).

Fourth District   No. 4—92—0659

Argued March 23, 1993.—Opinion filed June 10, 1993.

John B. Lower and Jeff M. Plesko (argued), both of Guardianship & Advocacy Commission, of Anna, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

This case concerns the operation of section 2—107.1 of the Mental Health and Developmental Disabilities Code (Code) (Ill. Rev. Stat. 1991, ch. 91½, par. 2—107.1), which provides for procedures whereby a court order may be obtained for the administration of psychotropic medication to a person for that person's benefit but against his or her will. The circuit court here entered such an order. One of the issues raised, whether the legislation meets constitutional muster, is now before the Illinois Supreme Court (*In re C.E.* (Cir. Ct. Cook Co., Mar. 30, 1992), No. 91—COT—06, *appeal allowed* (1992), No. 73605). We need not pass on that question here because we conclude that even if the legislation is valid, reversal is required for other reasons.

On July 10, 1992, Dr. Barry M. Rebeck, a psychiatrist, filed a petition in the circuit court of Macon County, pursuant to section 2—107.1 of the Code, seeking authority for the clinical staff of Adolf Meyer Mental Health and Developmental Center of Decatur (Meyer Center) to administer psychotropic medicine to respondent Pat Brazelton against her will. The court set the matter for hearing on July 21, 1992, and an assistant public defender was appointed to represent respondent. Respondent was personally served with notice of that hearing on July 13, 1992. Appointed counsel was present in court on July 20, 1992, when a request by the petitioner to continue the proceedings was allowed without objection by respondent's counsel. The cause was continued until August 4, 1992.

On August 4, 1992, respondent appeared with counsel and made an oral motion for a jury trial. The court denied the motion for the stated reason that the Code makes no provision for a jury trial in regard to a section 2—107.1 petition. The court then conducted a

bench hearing on the petition and found for the petitioner. On August 6, 1992, the court entered an order authorizing the Meyer Center clinical staff to administer psychotropic medication to respondent for a period not to exceed 90 days. On August 12, 1992, on respondent's motion, the court stayed the foregoing order until further order of the court.

Respondent has appealed, contending (1) the court's order violated constitutional and statutory guarantees; (2) the proof did not support the order entered; and (3) the court erred in denying respondent a jury trial. As we have indicated, no useful purpose would be served by our attempting to decide the constitutional issue here. The question of statutory violation is so intertwined with the first question that our attempts to decide that would also be useless. Moreover, we need not decide either of the foregoing questions because error in the handling of the jury trial issue requires reversal. We do pass upon the sufficiency of the evidence to support the verdict because, if insufficient, we must reverse outright. If the evidence was strong enough to uphold the order, we can merely reverse and remand for a new trial if the supreme court upholds the validity of section 2—107.1 of the Code. Accordingly, we consider the sufficiency of the evidence first.

The State's only witness was Dr. Rebeck, who testified as follows: (1) he most recently observed respondent on the day of the hearing and the day before; (2) respondent had been diagnosed with a serious mental illness; (3) respondent's behavior had deteriorated, i.e., according to family reports she used to be gainfully employed and due to her illness she had been unable to work for the last few years; (4) prior to her being admitted to the Meyer Center she was so preoccupied with her delusions and her fixations she could no longer function independently; (5) respondent's illness existed for both "a period marked by the continuing presence of those symptoms" and by the "repeated episodic occurrence of symptoms"; and (6) a course of treatment including the administration of psychotropic medication had been developed for respondent which was "consistent within a reasonable degree of psychiatric certainty as to appropriateness and likelihood of benefit."

Dr. Rebeck described the proposed treatment of psychotropic medications as including "either a long[-]acting form that could be injected or an oral form, if the patient would comply with taking that and depending upon her response. The dosage and the amount would be demonstrated by her response." Specifically, Dr. Rebeck testified he would prescribe Haldol or Prolixin Enanthate or similar

antipsychotic medications based on how respondent responds to the medications.

Dr. Rebeck further testified (1) he believed the benefits of psychotropic medication would outweigh the harm of the medication; (2) at that time respondent lacked the capacity to make a reasonable decision about taking the medication; (3) the staff members at the Meyer Center had repeatedly attempted to talk with respondent; however, she was preoccupied with her delusional thoughts; (4) the staff had attempted to obtain respondent's voluntary agreement to take the medication; and (5) he considers the involuntary administration of psychotropic medication essential to respondent's proper treatment.

On cross-examination, Dr. Rebeck testified as follows: (1) he had not observed respondent ever behave in a threatening manner to herself or others aside from being verbally aggressive when her delusions were challenged; (2) respondent's mother told him that "prior to her being admitted to [the] hospital [respondent] was driving in a car and because of her response to a perceived disturbance she almost accidentally drove her car off a bridge"; (3) he based his opinion that respondent's behavior was deteriorating on the fact she could not independently function or work because of her preoccupation with delusional thoughts; (4) less restrictive services such as psycho-education and psychotherapy would be futile for respondent because she neither believed she had a mental illness nor was she willing to hear about having a mental illness; and (5) without the administration of medication, respondent would be subject to either long-term hospitalization or isolation at home while totally dysfunctional.

Respondent testified on her own behalf as follows: (1) she was 46 years old; (2) she worked outside the home for 12 years and had lived independently; (3) she had no prior hospitalizations and she was involuntarily admitted to the Meyer Center because of a "harassment situation because they would not open up to a hypnosis that was being done[;] I didn't want to go in and they put me in anyway"; (4) she had never harmed herself or others; (5) she had the mental capacity to decide whether to take psychotropic medication; (6) she refused the medication because she felt "psychotropics, as explained to [her], [was] the same as 'moban' medicine which was given to [her] by a doctor in Louisville. Did no good. Didn't get rid of the harassment going on. Not only that it made [her] extremely miserable"; and (7) when she took the other medication she "shook constantly."

On cross-examination, respondent testified that she was never hospitalized in Louisville, Kentucky, but medication had been prescribed for her. The following colloquy took place regarding her experience in Kentucky:

"Q. [State's Attorney]: Were you in a hospital there?

A. [Respondent]: No, I wasn't in a hospital. I was working at Citizen's Fidelity as a program analyst there. I was in the process, being harassed. I had complained about a bugging where I worked at which turned into sound waves and hypnosis through an investigation.

Q. Who do you think is responsible for this?

A. It has been said Pinkerton Security.

Q. I'm sorry?

A. It has been said Pinkerton Security. It has also been brought out my husband and his father who were in the security business was also involved in hypnotizing me by sound waves or methods of sound waves.

Q. Do you think that is still going on?

A. I know it is still going on right here in your hospital."

■■ The proof required for the court to grant a section 2—107.1 order is set forth in section 2—107.1(d) of the Code, which states:

"Psychotropic medication shall not be administered to the recipient unless it has been determined by clear and convincing evidence that all of the following factors are present:

(1) That the recipient has a serious mental illness or developmental disability.

(2) That because of said mental illness or developmental disability, the recipient exhibits deterioration of his ability to function, suffering, or threatening or disruptive behavior.

(3) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in paragraph (2) of subsection (d) of this Section or the repeated episodic occurrence of these symptoms.

(4) That the benefits of the psychotropic medication will outweigh the harm.

(5) That the recipient lacks the capacity to make a reasoned decision about the medication.

(6) That other less restrictive services have been explored and found inappropriate."

Ill. Rev. Stat. 1991, ch. 91½, par. 2—107.1(d).

Section 2—107.1(d) of the Code requires proof "by clear and convincing evidence." (Ill. Rev. Stat. 1991, ch. 91½, par. 2—107.1(d).) However, as this court stated in the case of *In re Jeffers* (1992), 239 Ill. App. 3d 29, 35, 606 N.E.2d 727, 731, that requirement is one for the trial court under section 2—107.1(d) of the Code and we will give great deference to the determination of the trier of fact and should "reverse only if the trial court's decision is manifestly erroneous." That was not the case here. Dr. Rebeck's testimony covered every aspect of the required proof.

■ Respondent objected to Dr. Rebeck's reliance on hearsay reports from respondent's family in regard to her deterioration in her ability to function. Where, as here, hearsay evidence is received without objection, it should be considered for whatever probative value it has. (*People v. Collins* (1985), 106 Ill. 2d 237, 263, 478 N.E.2d 267, 278.) The use of hearsay information, if reasonably relied upon, is one of the usual ways for a psychiatrist to make a diagnosis. (See *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485.) The information Rebeck related was sufficient for him to conclude that respondent had a serious illness and was exhibiting a deteriorating ability to function. The evidence concerning the bridge episode helped in making that determination. The indications of paranoia apparent in respondent's testimony also supported the court's decision on this issue.

In giving his opinion that the benefits of the proposed medication exceeded the harm which could be caused, Dr. Rebeck stated in cautious terms that the proposed medication was reasonably likely to be appropriate, and the result of not using the medication would likely be long-term hospitalization or isolation in a dysfunctional state at home. The refusal of the respondent to take the medication was readily apparent from all of the testimony.

The respondent was not entitled to have the petition dismissed in bar of action for lack of proof and we will not reverse without remandment.

■ Respondent's claim to a right to trial by jury on the section 2—107.1 petition arises from subsection (c) thereof, which states:

"Unless otherwise provided herein, the procedures set forth in Article VIII of Chapter 3 of this Act, including the provisions regarding appointment of counsel, shall govern hearings under this Section." Ill. Rev. Stat. 1991, ch. 91½, par. 2—107.1(c).

Section 3—802 of the Code, which is part of chapter 3, article VIII, of the Code states:

"The respondent is entitled to a jury on the question of whether he is subject to involuntary admission. The jury shall consist of 6 persons to be chosen in the same manner as are jurors in other civil proceedings." Ill. Rev. Stat. 1991, ch. 91½, par. 3—802.

The statement in section 3—802 of the Code that a respondent is entitled to a jury trial on the question of involuntary admission does not "provide otherwise" in regard to a right of a section 2—107.1 respondent to a jury trial arising from the incorporation of section 3—802 procedures. Section 3—802 was part of the Code when it became effective January 1, 1979. (See Pub. Act 80—1414, eff. January 1,. 1979 (1978 Ill. Laws 1462, 1484).) Section 2—107.1 became effective August 13, 1991 (see Pub. Act 87—124, §1, eff. August 13, 1991 (1991 Ill. Laws 992)) and made procedures and rights previously limited to certain proceedings also applicable to actions under section 2—107.1. Nothing else in the Code provides that a respondent's right to jury trial is not applicable to section 2—107.1. The State admits the foregoing interpretation is correct and that respondent had a right to a jury trial but maintains respondent waived that right.

The State's theory of waiver begins with section 6—100 of the Code, which states that "[j]udicial proceedings conducted pursuant to this Act shall be conducted in accordance with the Civil Practice Law, except to the extent the provisions of this Act indicate to the contrary or are inconsistent, in which case this Act governs." (Ill. Rev. Stat. 1991, ch. 91½, par. 6—100.) Section 2—1105 of the Civil Practice Law states that "[a] defendant desirous of a trial by jury must file a demand therefor not later than the filing of his or her answer" or the right to a jury is waived (Ill. Rev. Stat. 1991, ch. 110, par. 2—1105). In civil cases, Supreme Court Rule 101(d) requires an answer or appearance to be filed within 30 days of service upon that defendant. 134 Ill. 2d R. 101(d).

On the other hand, neither section 2—107.1 of the Code nor article VIII of chapter 3 of the Code imposes any duty upon a respondent to file a responsive pleading. The practice is not to file a responsive pleading and an implied requirement to do so would be inconsistent with the intent that section 2—107.1 creates a "speedy and efficient" manner of treating mentally ill patients who lack the capacity to make reasoned decisions in regard to medication. Report of the Governor's Commission to Revise the Mental Health Code of Illinois 45 (1989).

The State emphasizes the decision of the supreme court in *Village of Park Forest v. Walker* (1976), 64 Ill. 2d 286, 356 N.E.2d 42, where that court upheld a circuit court decision to deny a 12-person jury to a defendant in an ordinance violation case where he made his request the day the case was called for trial. The plaintiff had previously demanded a six-member jury, and the case had been tried before such a jury. The court pointed out that in *City of Danville v. Hartshorn* (1973), 53 Ill. 2d 399, 292 N.E.2d 382, it had held that in such a case the right to a jury trial was governed by section 64 of the then Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 64), which was the same as the present section 2—1105 of the Civil Practice Law. The *Walker* court pointed out that the difficulty with that analogy was that section 64 of the Civil Practice Act referred to filing a demand at the time of answer and defendants to ordinance violation charges were not required to file answers. However, the court concluded that since the defendant had 10 months after the filing of the charges before the case went to trial, defendant was unduly tardy in not requesting a jury until day of trial.

The *Walker* court analogized the situation in an ordinance violation case to that in a small claims case where Supreme Court Rule 285 required a defendant's demand for a jury was required to be filed at the time of appearance. (See 43 Ill. 2d R. 285.) The State maintains that would be an appropriate rule to apply to section 2—107.1 proceedings. However, as we have indicated, the Code makes no provision for any appearance by or on behalf of a respondent prior to hearing.

The *Walker* court also pointed out that a motion for leave to file a late jury demand could have been filed under then section 59 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 59), which provided for, upon good cause shown, a discretionary granting by a trial court of additional time to take any step prior to judgment. (*Walker*, 64 Ill. 2d at 300, 356 N.E.2d at 49.) The *Walker* court noted that in *Hudson v. Leverenz* (1956), 10 Ill. 2d 87, 139 N.E.2d 255, the supreme court had upheld a discretionary decision of a trial court to allow the filing of a late jury demand. Similarly, in *Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90, 382 N.E.2d 1201, the supreme court upheld an appellate court's judgment reversing a circuit court order denying a late request for a jury trial.

The foregoing cases have several implications which would seem to be applicable to the time for making jury demands in section 2—107.1 proceedings. One is that no exact time limit is imposed. An-

other is that the demand must be made in a reasonable time. The third is that the court must exercise a discretion before denying a late request for a jury trial.

Here, the case had originally been set for hearing on July 21, 1992, but was continued on the motion of petitioner until August 4, 1992. Respondent's counsel could have made a jury request at that time. The requirement of section 2—107.1 of the Code that a hearing be held within 30 days of the filing of the petition placed a further restriction on the court unless a request by a respondent for a jury trial which would require a delay beyond the 30-day deadline would constitute a waiver by a respondent of the 30-day rule. Here, the 30-day period would have expired in less than a week from the time respondent made a jury request. Most importantly, the difficulties that arise when a party waits until the day of trial to make a jury demand are readily apparent. Clearly, if the court here had considered respondent's demand, recited difficulties that would arise in obtaining jurors or other disruptions to court proceedings, no error would result in the denial of the request for a jury.

Here, the court did not exercise the discretion it possessed. No effort was made to determine whether a jury could easily be obtained. The legislature obviously deemed the right of trial by jury an important aspect of the sensitive decision which must be made in determining whether mind-altering substances can be imposed upon an individual who does not want the medicine. Under the circumstances, we deem highly significant the statement of the supreme court in regard to a trial court's ruling on a request to make a tardy request for a jury trial. That court stated that the issue on review is not whether the reviewing court "would have allowed the [request], but whether the action was *a reasonable exercise of sound discretion.*" (Emphasis added.) (*Hernandez*, 73 Ill. 2d at 95, 382 N.E.2d at 1203.) Respondent did not have that benefit here.

The State maintains that the circuit court's failure to exercise discretion in determining whether respondent's jury demand was too late is harmless error at worst because the proof of the petitioner's case was so strong that a jury would have been sure to approve it. Just as we gave deference to the determination of the court in finding in favor of the petitioner, we do not assume another trier of fact would have decided the same way. A jury viewing the witnesses could have concluded that Dr. Rebeck's opinions were based on too skimpy actual knowledge of the respondent. We do not agree that any error was harmless.

Because of the importance of the right to trial by jury, the uncertainty as to when the demand for such a trial should be made here, and the lack of exercise of discretion by the court before denying a jury trial, we hold that the order appealed must be reversed and the cause remanded to the circuit court of Macon County. That court should await the final decision by the supreme court in the case of C.E. and if the validity of section 2—107.1 of the Code is upheld, grant respondent's jury request and proceed to try the issues before a jury. If the supreme court should determine that section 2—107.1 is invalid, the court should then dismiss the petition.

Reversed and remanded with directions.

KNECHT and COOK, JJ., concur.