(No. 73605.—

*In re* C.E., Asserted to be a Person in Need of Involuntary Psychotropic Medication (C.E. *et al.*, Appellees; the Department of Mental Health and Developmental Disabilities, Appellant).

*Opinion filed May 19, 1994.—Rehearing denied October 3, 1994.*

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jennifer A.

Keller, Assistant Attorney General, of Chicago, of counsel), for appellant.

John B. Lower and William E. Coffin, of the Guardianship and Advocacy Commission, of Chicago, for appellee C.E.

Mark B. Epstein, of Chicago, for appellee L.E.

Mark J. Heyrman, of Chicago (Brian Bossert, law student), for *amicus curiae* Mandel Legal Aid Clinic.

JUSTICE McMORROW delivered the opinion of the court:

Section 2—107.1 of the Mental Health and Developmental Disabilities Code (hereinafter the Mental Health Code) (405 ILCS 5/2—107.1 (West 1992)) permits the trial court to authorize the involuntary administration of psychotropic medication to a person receiving mental health treatment when the court finds by clear and convincing proof, following a full hearing, that the recipient of mental health services is incapable of making the drug-treatment decision on his own behalf and is suffering from one or more of the conditions specified in the statute. (See 405 ILCS 5/2—107.1(d) (West 1992).) Although petitioned to authorize the involuntary administration of psychotropic substances under section 2—107.1, the trial court in the instant cause refused to do so, reasoning that section 2—107.1 was void as unconstitutional on its face. The Attorney General, on behalf of the Department of Mental Health and Developmental Disabilities, appeals from this ruling. (134 Ill. 2d R. 302(a).) We conclude that section 2—107.1 is not facially invalid on the constitutional grounds advanced in this appeal. Accordingly, we reverse and remand.

### I

The recipient of mental health services in this case is C.E., an adult male whom the circuit court found subject to involuntary admission to a hospital for treatment and evaluation in August 1991. At this initial commitment hearing, the court determined the evidence showed, by clear and convincing proof, that appointment of a temporary guardian was necessary for C.E.'s welfare and protection because of his psychotic condition. The court specifically found that C.E.'s refusal to accept and take prescribed medical and psychiatric tests and treatments was a product of his psychotic state.

On the basis of these findings, the court appointed C.E.'s father, L.E., as C.E.'s temporary guardian. The court granted L.E. the power to give informed consent to the administration of generally accepted medical and psychiatric treatment, including but not limited to psychotropic medication. The trial court determined that the provisions of section 2—107.1 did not apply to the proceedings before it, because the statute was not in effect when L.E.'s petition was initially filed. However, the trial court's order further provided that L.E., as guardian for C.E., could not authorize psychotropic medication until all of the following conditions were met:

> "(a) the treating physician has first conducted the appropriate screening tests for such medication; (b) the treating physician has confirmed that [C.E.] has been medically cleared for the administration of psychotropic medication; and (c) the attorney for [C.E.] and the Guardian Ad Litem have determined to their satisfaction that [C.E.] has been properly medically cleared for the administration of psychotropic medication."

When L.E.'s temporary guardianship powers under the trial court's order were about to expire, L.E. filed a petition to renew his broad guardianship powers under the original order issued by the probate court which allowed forced administration of psychotropic medica-

tion. Because L.E. believed that his broad guardianship powers would be improperly restricted under section 2—107.1 of the Mental Health Code (405 ILCS 5/2—107.1 (West 1992)), L.E. filed a petition that the court declare section 2—107.1 unconstitutional.

Thereafter, the trial court appointed the Guardianship and Advocacy Commission as attorney for C.E. The Attorney General appeared on behalf of the Department of Mental Health and Developmental Disabilities, in order to defend the constitutionality of the statute, and filed a motion to dismiss the father's petition to declare section 2—107.1 unconstitutional. The Attorney General also filed a motion to dismiss L.E.'s petition on the ground that L.E. lacked standing to challenge the constitutionality of the statute. Later, counsel for C.E. filed a petition for declaratory relief and requested that the trial court declare section 2—107.1 unconstitutional.

Following briefing and argument, the trial court determined that L.E. had standing to challenge the constitutionality of section 2—107.1. In a lengthy memorandum opinion, the court found section 2—107.1 facially unconstitutional and held the section null and void. The Attorney General, on behalf of the Department of Mental Health and Development Disabilities, filed a direct appeal from the trial court's order. 134 Ill. 2d R. 302(a).

II

Generally, under the Mental Health Code (405 ILCS 5/2—100 et seq. (West 1992)), an adult recipient of mental health services or the recipient's guardian has the authority and the right to refuse recommended mental health services, including medication. (405 ILCS 5/2—107 (West 1992).) If the recommended services are refused, the recipient or guardian must be informed of alternative services also available, as well as the risks of such alternatives, and must additionally be advised of

the possible consequences of refusing the services. 405 ILCS 5/2—107 (West 1992).

The Mental Health Code further provides that the recommended mental health services may be administered against the wishes of the recipient or guardian when "such services are necessary to prevent the recipient from causing serious harm to himself or others." (405 ILCS 5/2—107 (West 1992).) In *In re Orr* (1988), 176 Ill. App. 3d 498, the court held that this provision allows the involuntary administration of pyschotropic medication either where the mental health recipient is incapable of making the decision in his own behalf, or where the recipient poses an immediate threat of serious physical harm to himself or others. *Orr*, 176 Ill. App. 3d at 510.

In light of the court's decision in *Orr*, the circuit courts in some counties, such as the circuit court of Cook County in the instant appeal, undertook to describe those circumstances under which a guardian could consent to the administration of psychotropic medication when the ward was incapable of making this treatment decision in his own behalf. A Commission appointed by the Governor in 1989 to revise the Mental Health Code found serious flaws in the failure to provide adequate guidelines for the involuntary administration of psychotropic substances. The Commission also found numerous shortcomings in the use of guardianship proceedings to determine whether involuntary administration of psychotropic medication should be ordered. (See Report of the Governor's Commission to Revise the Mental Health Code of Illinois 44-47 (1989).) The Commission recommended that the Mental Health Code be amended to specifically provide for the involuntary administration of psychotropic medication in nonemergency settings.

Section 2—107.1, which was adopted and took effect on August 13, 1991 (see Pub. Act 87—124, § 1), delineates

the nonemergency circumstances under which psychotropic medication may be administered against the wishes of the recipient. Under section 2—107.1, psychotropic medication may be administered to one who is receiving mental health services, even though the recipient may not consent to such treatment, provided the standards and procedures set out in the section are satisfied. 405 ILCS 5/2—107.1 (West 1992).

In order to authorize such a procedure under section 2—107.1, a petition must be filed in the circuit court requesting a court order to administer the medication. This petition may be filed by any person at least 18 years of age. (405 ILCS 5/2—107.1(a) (West 1992).) In addition, section 2—107.1 directs that forced administration of psychotropic medication is only authorized if the court finds evidence of each of the following elements, by clear and convincing proof:

"(1) That the recipient has a serious mental illness or developmental disability.

(2) That because of said mental illness or developmental disability, the recipient exhibits deterioration of his ability to function, suffering, or threatening or disruptive behavior.

(3) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in paragraph (2) [above] or the repeated episodic occurrence of these symptoms.

(4) That the benefits of the psychotropic medication will outweigh the harm.

(5) That the recipient lacks the capacity to make a reasoned decision about the medication.

(6) That other less restrictive services have been explored and found inappropriate." 405 ILCS 5/2—107.1(d) (West 1992).

Once the petition for authorization of forced administration of the medication is filed, the circuit court is directed to hold a hearing within 30 days. (405 ILCS 5/2—107.1(b) (West 1992).) Section 2—107.1 limits

orders authorizing involuntary administration of medication to duration of 90-day intervals, although additional 90-day periods may be authorized "without limitation" provided additional hearings are held in compliance with the provisions of the statute. (405 ILCS 5/2—107.1(e) (West 1992).) The court's order must designate the individuals who are authorized to administer the medication. (405 ILCS 5/2—107.1(f) (West 1992).) In addition, a guardian is authorized to consent to the administration of psychotropic medication only in accordance with the standards and procedures of the section. 405 ILCS 5/2—107.1(g) (West 1992).

### III

We first address the parties' arguments with respect to whether L.E., the father of the respondent C.E., has standing to challenge the constitutionality of section 2—107.1.

Generally, in order to have standing to pursue a declaratory judgment action, a party must be "interested" in the matter in controversy. (See 735 ILCS 5/2— 701 (West 1992) (standing to pursue declaratory judgment action).) To be "interested," one "must possess a personal claim, status, or right which is capable of being affected. [Citations.]" *Underground Contractors Association v. City of Chicago* (1977), 66 Ill. 2d 371, 376; see also *Greer v. Illinois Housing Development Authority* (1988), 122 Ill. 2d 462, 492-93.

This court considered a similar question in *In re Estate of Longeway* (1989), 133 Ill. 2d 33. In that case, a guardian filed a petition for a declaratory judgment to determine whether the guardian had the power to authorize the withdrawal of artificial hydration and nutrition on behalf of the ward. This court held that the guardian had the standing to file such a request for declaratory judgment relief. This court found it significant that the guardian's suit was not instituted on

behalf of the ward, but "merely petition[ed] the court for authority to perform an act which [was allegedly] within the implied authority granted [to the guardian] by the Probate Act." *Longeway,* 133 Ill. 2d at 46 (distinguishing *In re Marriage of Drews* (1986), 115 Ill. 2d 201); see also *In re Estate of Greenspan* (1990), 137 Ill. 2d 1, 13.

We find the reasoning in *Longeway* equally applicable to the present cause and conclude that respondent's father, L.E., possesses sufficient interest in the matter in controversy to challenge the constitutionality of section 2—107.1 of the Mental Health Code. The record indicates that L.E. was still C.E.'s guardian at the time he filed the motion to declare section 2—107.1 unconstitutional. L.E.'s motion sought to continue his power as C.E.'s guardian to consent to the administration of psychotropic medication to C.E. without the need to resort to further judicial review, based upon the broad guardianship powers to make decisions regarding a ward's "support, care, comfort, health, education and maintenance" under the Probate Act of 1975 (755 ILCS 5/11a—17 (West 1992)). On this basis, L.E.'s motion sought a declaration that section 2—107.1 of the Mental Health Code is unconstitutional. Because L.E. was seeking guidance from the court regarding L.E.'s guardianship powers under the Probate Act and the Mental Health Code, L.E. had standing to challenge the constitutionality of section 2—107.1.

IV

Respondent, C.E., and his father, L.E., seek to justify the trial court's holding that section 2—107.1 is null and void because it is unconstitutional on its face. However, such an argument must overcome considerable hurdles:

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the

challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment. [Citation.]" *United States v. Salerno* (1987), 481 U.S. 739, 745, 95 L. Ed. 2d 697, 707, 107 S. Ct. 2095, 2100.

Bearing in mind these principles, we review the parties' arguments in this appeal.

### A. Constitutional Right to Refuse Psychotropic Medication

The main thrust of C.E.'s challenge to the constitutionality of section 2—107.1 is his claim that he has a fundamental interest in refusing medical treatment. According to C.E., section 2—107.1 is facially unconstitutional because it impermissibly infringes upon his fundamental constitutional right, under the United States and Illinois Constitutions, to refuse the administration of psychotropic medication. The questions of whether there is a constitutional right to refuse pyschotropic medication, and the circumstances under which the government may exercise a legitimate basis to override the patient's wishes, have spawned considerable commentary. See A. Doudera & J. Swazey, Refusing Treatment in Mental Health Institutions—Values in Conflict (1982) (hereinafter Refusing Treatment); Cichon, *The Right to "Just Say No": A History and Analysis of the Right to Refuse Antipsychotic Drugs*, 53 La. L. Rev. 283 (1992) (hereinafter *"Just Say No"*); Brakel & Davis, *Taking Harms Seriously: Involuntary Mental Patients and the Right to Refuse Treatment*, 25 Ind. L. Rev. 429 (1991); Cichon, *The Potential Impact of Harper v. Washington on South Dakota's Statutory Right to Refuse Psychiatric Treatment*, 36 S.D. L. Rev. 478 (1991); Winick, *The Right to Refuse Mental Health Treatment:*

*A First Amendment Perspective*, 44 U. Miami L. Rev. 1 (1989); Cichon, *The Eighth Circuit and Professional Judgment: Retrenchment of the Constitutional Right to Refuse Antipsychotic Medication*, 22 Creighton L. Rev. 889 (1989); Beck, *Right to Refuse Antipsychotic Medication: Psychiatric Assessment and Legal Decision-making*, 11 Mental & Physical Disability L. Rep. 368 (1987); Gelman, *Mental Hospital Drugs, Professionalism, and the Constitution*, 72 Georgetown L.J. 1725 (1984); Gutheil & Appelbaum, *"Mind Control," "Synthetic Sanity," "Artificial Competence," and Genuine Confusion: Legally Relevant Effects of Antipsychotic Medication*, 12 Hofstra L. Rev. 77 (1983); Gaughan & LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 L. & Psychol. Rev. 43 (1978); Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 Nw. U.L. Rev. 461 (1977); Comment, *Pathway Through the Psychotropic Jungle: The Right to Refuse Psychotropic Drugs in Illinois*, 18 J. Marshall L. Rev. 407 (1985).

C.E. initially argues that he has a fundamental constitutional privacy right that encompasses the right to refuse medical treatment. We have previously declined to consider this issue, and also choose not to address the question in this appeal. In *Longeway*, this court acknowledged that it "[l]ack[ed] guidance from the [United States] Supreme Court" regarding "whether Federal privacy guarantees the right to refuse *** medical treatment." (*Longeway*, 133 Ill. 2d at 44.) In addition, "[l]acking a clear expression of intent from the drafters of our 1970 State constitution, we similarly abstain[ed] from expanding the privacy provision of our State constitution to embrace this right. [Citation.]" (*Longeway*, 133 Ill. 2d at 44.) We find these observations equally applicable to the present cause, and decline C.E.'s invitation to determine whether there is a Federal

or State constitutional right to privacy that encompasses a right to refuse medical treatment.

However, we believe that C.E. possesses a Federal constitutional right to refuse the administration of psychotropic medication under the "liberty" interests recognized in constitutional jurisprudence. According to United States Supreme Court precedent, there can be "no doubt" (*Washington v. Harper* (1990), 494 U.S. 210, 221, 108 L. Ed. 2d 178, 198, 110 S. Ct. 1028, 1036) but that a mentally ill person such as C.E. has a liberty interest, under the due process clause of the fourteenth amendment to the United States Constitution, to refuse to be medicated with psychotropic substances. In *Washington v. Harper* (1990), 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028, the Court held that a State prisoner has a liberty interest, under the due process clause of the fourteenth amendment to the United States Constitution, in refusing the administration of psychotropic medication. And in *Cruzan v. Director, Missouri Department of Health* (1990), 497 U.S. 261, 279, 111 L. Ed. 2d 224, 242, 110 S. Ct. 2841, 2851-52, the Court acknowledged that all persons have a protected liberty interest under the fourteenth amendment to the Constitution to refuse certain medical treatments. (See also *Vitek v. Jones* (1980), 445 U.S. 480, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (State prisoner has protected liberty interest in proper procedures for transfer to mental hospital); *Youngberg v. Romeo* (1982), 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (person involuntarily admitted to State mental institution has protected liberty interest in safe conditions of confinement, freedom from unnecessary bodily restraints, and right to minimally adequate degree of training); *Mills v. Rogers* (1982), 457 U.S. 291, 73 L. Ed. 2d 16, 102 S. Ct. 2442 (noting, but not deciding, question of whether involuntarily admitted mental patients have constitutional right to refuse

treatment with psychotropic drugs).) In light of this precedent, it appears that persons who are mentally ill or developmentally disabled have a Federal constitutionally protected liberty interest to refuse the administration of psychotropic drugs.

Two fundamental concerns have guided our conclusion that the prerogative to refuse unwanted psychotropic medication is a protected right of the mental health recipient. The first of these concerns arises from the substantially invasive nature of psychotropic substances and their significant side effects. (See generally Blackwell, *Schizophrenia and Neuroleptic Drugs: A Biopsychosocial Perspective,* in Refusing Treatment, at 3-18.) Psychotropic drugs have been described as "mood altering." (*Davis v. Hubbard* (N.D. Ohio 1980), 506 F. Supp. 915, 927.) Their beneficial effects occur by their power to cause the brain to "integrate perceptions and memory," thereby "stabiliz[ing] and blunt[ing] thought processes." (*Davis v. Hubbard,* 506 F. Supp. at 927.) However, the potential side effects of psychotropic drugs are numerous—drowsiness, fatigue, dry mouth and throat, blurred vision, impaired eyesight and blindness, weight gain, skin disorders, blood disorders, jaundice, liver dysfunction, and cardiovascular problems. (See, *e.g.,* Cichon, *"Just Say No,"* 53 La. L. Rev. at 297-300.) The medication may also cause patients to suffer side effects similar to Parkinson's disease (rigid, mask-like face, tremors, drooling), or may cause a condition known as akathisia, where a person may be unable to sit still or may suffer an irresistible desire to walk continuously. (Cichon, *"Just Say No,"* 53 La. L. Rev. at 300-03.) More serious is a permanent side effect known as tardive dyskinesia, where the person suffers from involuntary muscle movements; its advanced stage interferes with motor activity, causing difficulty in speech, breathing, or swallowing. (Cichon, *"Just Say No,"* 53 La. L. Rev. at

303-07.) The condition may not appear until late in the course of treatment and is thought to be permanent and "fairly widespread." (*Davis v. Hubbard*, 506 F. Supp. at 929.) Still another side effect is neuroleptic malignant syndrome (NMS), whose "cardinal features *** are hyperthermia (fever), severe skeletal rigidity, elevated blood pressure, tachycardia, and alterations in consciousness including delirium, mutism, stupor, and coma." (Cichon, *"Just Say No,"* 53 La. L. Rev. at 307-08.) According to one commentator, .

> "NMS can last from several days to several weeks, even after antipsychotic medication is discontinued. This disorder is fatal in twenty to thirty percent of the cases with the risk of death being even higher when depot (sustained action intermuscular) forms of antipyschotics are used. Death usually occurs within three to thirty days after the onset of symptoms and is frequently caused by respiratory failure, cardiovascular collapse and acute kidney failure. NMS can also cause permanent neurological damage, indicated by dementia and signs of parkinsonism." Cichon, *"Just Say No,"* 53 La. L. Rev. at 308.

Our second concern is the recognition that psychotropic substances may be misused by medical personnel, and subverted to the objectives of patient control rather than patient treatment. C.E. reminds this court that it has already been observed that in the past, other governments have used involuntary psychiatric treatment as a "ruse" and a "device to silence critics" (*People v. Valentine* (1990), 201 Ill. App. 3d 10, 13) and that the mental health laws may be manipulated into a "tool to oppress" (*In re Long* (1990), 203 Ill. App. 3d 357, 364). Reported decisions have detailed instances where mental health personnel administered psychotropic substances, not for the patient's therapy, but for the purposes of managing and disciplining the patient. (See, *e.g.*, Brotman, *Behind the Bench on Rennie v. Klein*, in Refusing Treatment, at 31-41.) As one commentator has noted, "The over-crowded and under-staffed conditions

at most public institutions invited use of [psychotropic] drugs for purposes other than treatment, including restraint, punishment, and convenience." Cichon, *"Just Say No,"* 53 La. L. Rev. at 285.

A number of decisions from other jurisdictions have also considered whether and under what circumstances psychotropic drugs can be administered. In many of these cases, the court has recognized a mentally ill person's substantial liberty interest, under the due process clause of the fourteenth amendment to the United States Constitution, to refuse to be medicated by such drugs. (*United States v. Charters* (4th Cir. 1988), 863 F.2d 302; *Dautremont v. Broadlawns Hospital* (8th Cir. 1987), 827 F.2d 291; *Johnson v. Silvers* (4th Cir. 1984), 742 F.2d 823; *Bee v. Greaves* (10th Cir. 1984), 744 F.2d 1387; *Project Release v. Prevost* (2d Cir. 1983), 722 F.2d 960; *Rennie v. Klein* (3d Cir. 1983), 720 F.2d 266; *Woodland v. Angus* (D. Utah 1993), 820 F. Supp. 1497; *R.A.J. v. Miller* (N.D. Tex. 1984), 590 F. Supp. 1319; *United States v. Leatherman* (D.D.C. 1983), 580 F. Supp. 977; *Davis v. Hubbard* (N.D. Ohio 1980), 506 F. Supp. 915.) A few have also relied upon a constitutional right of privacy under the fourteenth amendment. (*Rogers v. Okin* (1st Cir. 1980), 634 F.2d 650, *remanded* (1982), 457 U.S. 291, 73 L. Ed. 2d 16, 102 S. Ct. 2442; *Rennie v. Klein* (3d Cir. 1983), 720 F.2d 266; *In re Mental Commitment of M.P.* (Ind. 1987), 510 N.E.2d 645; *In re Mental Health of K.K.B.* (Okla. 1980), 609 P.2d 747.) Several others have been persuaded by State constitutions or common law (*Large v. Superior Court* (1986), 148 Ariz. 229, 714 P.2d 399; *People v. Medina* (Colo. 1985), 705 P.2d 961 *(en banc)*; *Rogers v. Commissioner of Department of Mental Health* (1983), 390 Mass. 489, 458 N.E.2d 308; *In re Guardianship of Roe* (1981), 383 Mass. 415, 421 N.E.2d 40; *Jarvis v. Levine* (Minn. 1988), 418 N.W.2d 139; *Opinion of the Justices* (1983), 123 N.H. 554, 465 A.2d

484; *Rivers v. Katz* (1986), 67 N.Y.2d 485, 495 N.E.2d 337, 504 N.Y.S.2d 74; see generally Annot., *Nonconsensual Treatment of Involuntarily Committed Mentally Ill Persons with Neuroleptic or Antipsychotic Drugs as Violative of State Constitutional Guaranty*, 74 A.L.R.4th 1099 (1989)).

However, these reported decisions have also recognized that the State has a legitimate *parens patriae* interest in furthering the treatment of those who are mentally ill by forcibly administering psychotropic medication when the patient is not capable of making a sound decision in his own behalf. (See, *e.g., Opinion of the Justices* (1983), 123 N.H. 554, 465 A.2d 484; *Rivers v. Katz* (1986), 67 N.Y.2d 485, 495 N.E.2d 337, 504 N.Y.S.2d 74.) As one court aptly observed:

"[There are] many situations [where], despite the risks of harmful side effects, the administration of drugs to an individual is clearly in his best interests because of the beneficial effects that the drugs can have, including the amelioration of the patient's illness. In such situations, the failure to medicate an incompetent patient could have side effects—*e.g.*, the unnecessary and possibly irreversible continuation of his illness—far more harmful, and probable, than any that might result from the drugs themselves.

Thus, any treatment decision, including the decision not to treat, brings with it the potential for serious harm to the patient." (Emphasis omitted.) *Rogers v. Okin* (1st Cir. 1980), 634 F.2d 650, 660.

We believe that section 2—107.1 embodies this State's significant *parens patriae* interest in providing for persons who, while suffering from a serious mental illness or developmental disability, lack the capacity to make reasoned decisions concerning their need for medication. "In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'

[Citation]." (*Youngberg v. Romeo* (1982), 457 U.S. 307, 320, 73 L. Ed. 2d 28, 41, 102 S. Ct. 2452, 2460.) "It is the unquestioned right and imperative duty of every enlightened government, in its character of *parens patriae*, to protect and provide for the comfort and well-being of such of its citizens as, by reason of infancy, defective understanding, or other misfortune or infirmity, are unable to take care of themselves." *County of McLean v. Humphreys* (1882), 104 Ill. 378, 383; see also *Longeway*, 133 Ill. 2d at 52.

In our opinion, section 2—107.1 bears an important and substantial relationship to the State's interest as *parens patriae* in providing for mentally ill or developmentally disabled persons who lack the capacity to make informed decisions concerning psychotropic medications. It is especially significant that the provisions of section 2—107.1 are narrowly tailored to specifically address the State's concern for the well-being of those who are not able to make a rational choice regarding the administration of psychotropic medications. Section 2—107.1 provides strict standards that must be satisfied by clear and convincing evidence before medication can be ordered. The statute addresses the precise clinical disabilities involved—mental illness or developmental disability resulting in the incapacity to make reasoned decisions concerning psychotropic medications—and it provides a mechanism to determine, with specific reference to those disabilities, when such medications may be administered over the objections of a patient.

It is also significant that section 2—107.1 limits the involuntary administration of psychotropic medication to circumstances where the recipient, while incapacitated, is suffering from one of the specific conditions stated in the statute, *viz.*, a "deterioration of his ability to function, suffering, or threatening or disruptive behavior" (405 ILCS 5/2—107.1(d)(2) (West 1992)), and

where these conditions have "existed for a period marked by the continuing presence of the symptoms \*\*\* or the repeated episodic occurrence of these symptoms" (405 ILCS 5/2—107.1(d)(3) (West 1992)). Furthermore, it must be demonstrated that the benefits of the pyschotropic substances will outweigh the harm that may result from medication, and that other, less restrictive services have been considered and found ineffective. 405 ILCS 5/2—107.1(d)(4), (d)(6) (West 1992).

In addition, the statute requires a hearing before a trial court judge as a precondition to the involuntary administration of the medication. (405 ILCS 5/2—107.1(a) (West 1992).) This safeguard ensures that the medication will be used for therapeutic purposes and will not be misapplied as a means to discipline or "manage" the recipient. The statute also, and very importantly, limits psychotropic medication to 90-day periods of time. (405 ILCS 5/2—107.1(e) (West 1992).) Thus, section 2—107.1 not only ensures that only those persons who actually lack the capacity to make reasoned decisions concerning psychotropic medication will have that decision made for them by the court as surrogate, it also ensures that persons who actually lack the capacity to make reasoned decisions concerning psychotropic medication will only be given such medication for the period of time it is most needed. Following 90 days on medication, a respondent may well have his faculties restored and no longer require treatment.

In light of all of these considerations, we conclude that section 2—107.1 does not, on its face, impermissibly burden the Federal constitutional liberty interests of C.E.

C.E. contends that section 2—107.1 is unconstitutional because it does not specifically require application of the "substituted judgment" test. C.E. reminds this court that the "substituted judgment" analysis was

adopted in *Longeway* and *Greenspan*, in which this court found that a guardian may, in certain specifically limited circumstances, lawfully exercise a ward's common law right to refuse the administration of life-sustaining medical treatment. Under the substituted judgment analysis, the "surrogate decision-maker attempts to establish, with as much accuracy as possible, what decision the patient would make if he were competent to do so." (*Longeway*, 133 Ill. 2d at 49.) Under the "best interests" test, the court is guided by an objective standard of what a reasonable person would prefer under the circumstances of the particular case. See *Longeway*, 133 Ill. 2d at 48-49.

Initially, we note that section 2—107.1 does not explicitly adopt the "best interests" or the "substituted judgment" test. Neither phrase appears explicitly or verbatim in the language of section 2—107.1 We also find it noteworthy that section 2—107.1, by its terms, does not foreclose the court's consideration of the wishes expressed by the mental health recipient while the recipient was competent. Section 2—107.1 requires proof that the benefits of the psychotropic medication will outweigh its harms, and that other treatment alternatives have been considered and found ineffective. (405 ILCS 5/2—107.1(d)(4), (d)(5) (West 1992).) The wishes of the mental health recipient will often be highly pertinent to proof of these two factors. According to jurisprudential commentary, administration of psychotropic substances may be ineffective if the recipient does not agree to and accept the drugs:

> "The interaction of [numerous] *** variables, particularly the patient's subjective reaction to the medication, determine whether or not the pharmacologic effect of the drug will cause improvement in the patient's mental condition. *** Drugs produce an internal alteration which the patient has to accommodate and comprehend. If the patient perceives the drug therapy as a helping tool in

controlling impulses that threaten to overwhelm him, the patient will integrate the pharmacologic change caused by the drug into his egostructure, thereby improving his mental condition. On the other hand, if the patient perceives the drug as destructive and malignant, the pharmacologic effect will cause a reaction which is anti-therapeutic, worsening the patient's mental state ***." (Cole, *Patient's Rights vs. Doctors' Rights: Which Should Take Precedence*, in Refusing Treatment, at 58.)

Section 2—107.1 requires a showing, by clear and convincing proof, that the involuntary administration of the medication will outweigh the harms that may be caused by the medication. (405 ILCS 5/2—107.1(d)(4) (West 1992).) The recipient's subjective perceptions may well be an integral part of this proof. Thus, the factors specified in the statute may often require that the trial court take into account the subjective attitudes of the recipient while the recipient was competent.

Consequently, we conclude that section 2—107.1 permits the court's consideration of the "substituted judgment" of the mental health recipient, and that the court respect the wishes expressed by the mental health patient when the patient was capable of making rational treatment decisions in his own behalf. When those wishes have not been clearly proven, however, the court should be guided by an objective standard of reasonable-ness, as shown by the evidence presented. In this fashion, the court may preserve the integrity of the mental health patient while respecting the health care professional's duty to treat the patient. As one commen-tator has observed:

"The traditional approach [in the involuntary administra-tion of psychotropic medication] requires the decision-maker to evaluate both medical and other evidence and reach an independent decision on what is in the 'best interests' of the incompetent patient. The operative guideline is 'what a reasonable person would do if competent.' The more modern 'substituted judgment' stan-

dard requires the proxy to inquire into the values and preferences of the patient and attempt to make a decision as the patient would, were he competent.

The 'best interests' approach has been criticized as depriving incompetent individuals of rights which are accorded others 'by ignoring their uniqueness and imposing upon them the views of a hypothetical majority or 'reasonable man.' Community consensus replaces what are otherwise uniquely personal decisions. \*\*\*

The substituted judgment standard was developed in an attempt to afford respect to the personal values of the incompetent patient. However, in the many cases where clear evidence is lacking on how the incompetent patient would decide if competent, strict adherence to this doctrine converts it into a legal fiction. In these cases, the standard often camouflages the fact that the proxy is, in reality, making an independent decision for the incompetent individual.

The hybrid approach \*\*\* for guiding proxy decision-making appears to strike an appropriate balance between respect for an incompetent patient's individualism and concern for his health and protection. The court should look to the patient's previously expressed preferences, values, and beliefs in an effort to exercise a substituted judgment. However, if clear and convincing evidence on this matter is lacking, as it often is, the decision should be based on the patient's best interests." Cichon, *"Just Say No,"* 53 La. L. Rev. at 391-92.

See also *Charters I*, 829 F.2d at 498.

This interpretation of section 2—107.1, to permit a court's consideration of the patient's clearly expressed wishes while competent, is consistent with precedent of this court. For example, in *Greenspan*, this court discussed the public guardian's duty to act in the best interests of a ward who is incompetent, terminally ill, and whose death is imminent. The remarks of the court in *Greenspan* are equally applicable to the present cause:

"Though a guardian's duty is to act in a ward's best interest, such a standard is necessarily general and must be adapted to particular circumstances. One such circum-

stance is a ward's wish to exercise common law, statutory, or constitutional rights, which may sometimes influence or even override a guardian's own perception of best interests. [Citations.] This tension between a ward's legal rights of volition and a guardian's own judgment of the ward's best interests resembles the tension this court discerned in *Longeway* [citation] between the best-interests and substituted-judgment theories for deciding whether to discontinue an incompetent and terminally ill patient's artificial life support.

In *Longeway*, this court approved application of the substituted-judgment theory, which requires a surrogate decisionmaker to establish, as accurately as possible, what the patient would decide if competent. [Citation.] Ascertainment of what the patient would decide must be based on clear and convincing evidence of the patient's intent, derived either from a patient's explicit expressions of intent or from knowledge of the patient's personal value system. [Citation.]

If it is clearly and convincingly shown that [the ward's] wishes would be to withdraw artificial nutrition and hydration, and if the other established criteria for permitting such withdrawal are met, [the ward's] imputed choice cannot be governed by a determination of best interests by the public guardian *** or anyone else. Otherwise, the substituted-judgment procedure would be vitiated by a best-interests guardianship standard, elevating other parties' assessments of the meaning and value of life—or, at least, their assessments of what a reasonable individual would choose—over the affected individual's own common law right to refuse medical treatment. Accordingly, the public guardian is not prevented by a best-interests standard from seeking relief in accordance with [the ward's] wishes as determined by substituted-judgment procedure. [Citation.]" (*Greenspan*, 137 Ill. 2d at 17-18.)

Consistent with this reasoning in *Greenspan*, we conclude that a mental health recipient's wishes, when competent, will often be very relevant to a determination of whether psychotropic substances should be administered under section 2—107.1. In those instances

where there is no proof of the mental health recipient's views when the recipient was competent, the court should be guided by the best interests of the patient. Accordingly, we find no error, under Federal constitutional law, in the legislature's failure to expressly include the "substituted judgment" test in section 2—107.1.

L.E. argues that section 2—107.1 is unconstitutional because it does not permit a guardian the right to exercise the ward's wishes, unless there has been court approval of the guardian's decision. L.E. claims that the requirement of court intervention, under section 2—107.1, is an undue and improper infringement on the ward's right to choose the course of his own medical treatment. We disagree. "We do not view the court's role under this statutory scheme as an unwarranted intrusion into the area of therapeutic medical decisions made for psychiatric treatment. Instead, the court merely oversees the guardian's decision making to ensure that the guardian complies with the statutory protections of section 2—107.1 of the Code." *In re Guardianship of Austin* (1993), 245 Ill. App. 3d 1042, 1050.

L.E. also contends that section 2—107.1 violates the first amendment rights of persons to choose and follow their individual religious beliefs. We find no such infirmity in the statutory provision. Section 2—102(b) of the Mental Health Code authorizes the withholding of generally accepted medical treatment where necessary to respect the recipient's religious beliefs. (See 405 ILCS 5/2—102(b) (West 1992).) There is nothing to indicate that this provision of the Mental Health Code would not be applicable to a person who, although falling within the purview of section 2—107.1, nevertheless chose to refuse psychotropic medication for religious reasons. Consequently, we find L.E.'s argument on this point unpersuasive.

## B. Procedural Due Process

C.E. contends that section 2—107.1 violates procedural due process because it does not require that patients be served with notice of the proceedings against them. Section 2—107.1 specifies that "[u]nless otherwise provided [in that section], the procedures set forth in Article VIII of Chapter 3 of [the Mental Health Code] [405 ILCS 5/3—800 *et seq.* (West 1992)], including the provisions regarding appointment of counsel, shall govern hearings held under" section 2—107.1. (405 ILCS 5/2—107.1(c) (West 1992).) Article VIII, chapter 3, of the Mental Health Code pertains to matters such as venue and the recipient's right to a jury trial in the context of an involuntary civil commitment proceeding. See *In re Brazelton* (1993), 245 Ill. App. 3d 1028, 1034.

Section 3—806 of the Mental Health Code is one of the article VIII, chapter 3, provisions applicable to proceedings under section 2—107.1. Section 3—806 states that the "respondent shall be present at any hearing held under this Act unless his attorney waives his right to be present and the court is satisfied by a clear showing that the respondent's attendance would subject him to substantial risk of serious physical or emotional harm." 405 ILCS 5/3—806 (West 1992).

Applying the requirements of section 3—806 to section 2—107.1 proceedings, actual attendance of the mental health recipient and his counsel is required at the trial court's hearing to decide whether a mental health recipient should be subjected to involuntary administration of psychotropic medication. If the mental health recipient and his attorney must attend the court's hearing, it would follow that the court must first notify the recipient and his attorney of the date, time and place of the hearing in order to ensure their attendance. Thus, section 2—107.1 implicitly requires the court to notify the mental health recipient and his counsel of the date, time and place of the court's hearing

on the petition to order the involuntary administration of psychotropic medication. This prior-notice requirement is consistent with the notice requirements of the Mental Health Code regarding involuntary civil commitments. (See 405 ILCS 5/3—706 (West 1992) (once court sets date of hearing, court "shall direct that notice of the time and place of hearing be served upon the respondent, his attorney, and guardian, if any, his responsible relatives, and the facility director of the facility").) In light of these considerations, we conclude that the trial court must ensure that notice of the date, time and place of the section 2—107.1 hearing is served upon the mental health recipient, his attorney, his guardian (if any), and any other interested parties to the proceeding.

In view of section 2—107.1's inclusion of several of the statutory requirements regarding involuntary civil commitment proceedings, including notice of the pendency of the commitment hearing, we find precedent of this court, with respect to the effect of a court's failure to strictly comply with the notice requirements for involuntary civil commitment hearings, applicable to C.E.'s procedural due process claim in the present appeal. In *In re Splett* (1991), 143 Ill. 2d 225, this court rejected a respondent's argument that his involuntary civil commitment order should be set aside because he was not formally notified of the pendency of the proceedings. This court observed that the respondent had actual knowledge of the proceedings and that he and his attorney were "afforded *** the time to prepare for the proceeding and allowed *** an opportunity to be heard on the disposition of the matter." (*Splett*, 143 Ill. 2d at 232.) This court also found it significant that the respondent did not "contend that he was prejudiced by the lack of formal notice, nor d[id] we discern any manner in which his rights were adversely affected." *Splett*, 143 Ill. 2d at 232.

The instant cause is substantially similar to *Splett*. The record indicates that C.E. and his attorney were aware of the proceedings and were provided ample opportunity to respond to the arguments raised by the other parties to the matter. C.E. does not claim that he was prejudiced by the absence of formal notice, and we are unable to find any prejudice on the present record. Under the circumstances, C.E. cannot properly challenge section 2—107.1 for its lack of specific requirement that the respondent be provided formal notice of the proceedings.

## C. Unconstitutionally Vague

C.E. argues that section 2—107.1 is unconstitutionally vague because its terms are too imprecise to allow for common understanding. For example, C.E. points to the phrase "disruptive behavior," and suggests that what some people find "disruptive," others will not, and that as a result, persons of common intelligence must necessarily guess at its meaning. C.E. also observes that the term "threatening behavior" is vague. In addition, C.E. complains that the term "suffering" is ambiguous, and questions whether the term is limited to physical suffering, or whether it also includes emotional suffering. C.E. also argues that the term "deterioration in ability to function" is vague, because it does not specify what kind of deterioration is required or the areas in which deterioration may be significant. This court has previously set forth the guiding principles to determine whether a statute is void for vagueness:

"A statute is void for vagueness if it ' "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" ' [citation], or if there is an absence of standards restricting the discretion of governmental authorities or courts who apply the law [citations]. ***

Courts should strive whenever possible to construe a statute so as to uphold its constitutional validity [cita-

tions], and a vagueness challenge to a statute will not be upheld if judicial construction of the statute renders it sufficiently definite so as to preclude its arbitrary application [citations]." *People v. Lang* (1986), 113 Ill. 2d 407, 454-55.

We conclude that the phrases at issue in section 2—107.1 are capable of intelligent interpretation when read in the context of the statute and the overall purpose of the legislation. The statute applies where a person who is receiving mental health services is unable to make a decision in his own behalf regarding the administration of psychotropic substances. Section 2—107.1 limits the involuntary administration of psychotropic medication to circumstances where the recipient, while incapacitated, is suffering from one of the specific conditions stated in the statute, *viz.*, a "deterioration of his ability to function, suffering, or threatening or disruptive behavior" (405 ILCS 5/2—107.1(d)(2) (West 1992)), and where these conditions have "existed for a period marked by the continuing presence of the symptoms *** or the repeated episodic occurrence of these symptoms" (405 ILCS 5/2—107.1(d)(3) (West 1992)). Further, it must be demonstrated that the benefits of the psychotropic substances will outweigh the harm that may result from the medication, and that other, less restrictive services have been considered and found ineffective. 405 ILCS 5/2—107.1(d)(4), (d)(6) (West 1992).

When considered in the context of all of the requirements of section 2—107.1, the terms to which C.E. refers are not so vague that they are incapable of common understanding. The pertinent terms must be considered in the context of the mental illness or disability from which the mental health recipient is suffering and for which the psychotropic medication has been suggested. The testimony of mental health professionals will serve as adequate and sufficient guideposts for the trial court's

determination of whether the recipient's condition satisfies the requirements of the statute. " '[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised.' " (*Youngberg v. Romeo* (1982), 457 U.S. 307, 321, 73 L. Ed. 2d 28, 41, 102 S. Ct. 2452, 2461, quoting 644 F.2d 147, 178.) The statute's terms are not so vague that they defy common understanding in the mental health field. As the court observed in *In re Ingersoll* (1989), 188 Ill. App. 3d 364, 368, "When diagnosing and treating a mental health disorder, it is difficult to determine, diagnose, and treat the disorder because there are so many different abstract signs exhibited by those believed to be afflicted. This is a highly specialized area of medicine which is better left to the experts, who are the most knowledgeable sources of the different diagnoses, treatment, and prognoses."

C.E. also claims that the statute must be considered under a standard of strict scrutiny, because it seeks to proscribe protected first amendment expressions. According to C.E., the section authorizes the involuntary administration of psychotropic medication when the respondent is exhibiting "threatening or disruptive behavior." C.E. contends that by so doing, the statute penalizes protected first amendment rights.

We do not believe that the statute violates constitutionally protected speech rights of mental health recipients. Even assuming *arguendo* that the statute's reference to "threatening or disruptive behavior" implicates constitutionally protected "speech," the statute nevertheless survives constitutional scrutiny. In *United States v. O'Brien* (1968), 391 U.S. 367, 376-77, 20 L. Ed. 2d 672, 679-80, 88 S. Ct. 1673, 1678-79, the Supreme Court held:

"[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech ele-

ment can justify incidental limitations on First Amendment freedoms. *** [W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."

Applying these criteria to section 2—107.1, we conclude that the statutory provision does not impermissibly overburden the free expression rights of mental health recipients who, while incapable of making a decision in their own behalf, have refused the administration of psychotropic substances. The State bears a significant duty to care for those unable to make decisions in their own behalf, under the State's *parens patrie* power. The purpose of section 2—107.1 is not to control or suppress the free speech rights of those receiving mental health services, but rather to ensure their proper treatment so that they may return to productive and self-reliant living as quickly and efficiently as possible. We believe that the statute is narrowly tailored to serve these ends. Consequently, we find C.E.'s argument on this point inadequate ground to hold section 2—107.1 unconstitutional.

## D. Equal Protection

We also find no violation of equal protection in section 2—107.1. According to C.E. and his father, the statute impermissibly violates equal protection because it allows forced administration of psychotropic substances to one who has been under psychiatric care, but does not authorize forced administration of the drugs to one who has never been under psychiatric care. This argument misunderstands the meaning of the phrase "recipient of services" under the Code.

The provisions of the Mental Health Code specifi-

cally apply to one who is a "[r]ecipient of services," which is defined as a person "who has received or is receiving treatment." (405 ILCS 5/1—123 (West 1992).) Treatment is defined as "an effort to accomplish an improvement in the mental condition or related behavior of a patient" and "includes, but is not limited to, hospitalization, partial hospitalization, outpatient services, examination, diagnosis, evaluation, care, training, psychotherapy, pharmaceuticals, and other services provided for patients by mental health facilities." 405 ILCS 5/1—128 (West 1992).

Thus, once a person has been examined by a mental health professional, that person is a recipient of services. Thereafter, administration of psychotropic medication against the person's wishes can only be accomplished under section 2—107.1. In order to determine whether the person is in need of psychotropic medication, the person must have been evaluated by mental health professionals. Consequently, section 2—107.1 does not authorize the involuntary administration of psychotropic medication to an individual who has never been accorded psychiatric or other mental health evaluation or treatment.

We agree with the Attorney General that the trial court was in error when it concluded that the statute violates equal protection. The trial court found the statute unconstitutional because the court believed that persons subject to involuntary administration of psychotropic medication are wrongfully deprived of all of the procedural guarantees specified for appointment of a guardian under the Probate Act. However, there is nothing in section 2—107.1 that prevents or prohibits the trial court from appointing a guardian for the ward, or a guardian *ad litem* for the ward, if the trial court believes such appointment would serve the mental health recipient's interests. See 755 ILCS 5/11a—2,

11a—3, 11a—10 (West 1992) (requirements for appointment of guardian, attorney for ward, and guardian *ad litem*).

Under the Probate Act, the court may, on its own motion, adjudge a person to be disabled, and may appoint a guardian for the ward. (755 ILCS 5/11a—3(a) (West 1992).) In order to be in need of the appointment of a guardian, it must be shown that the ward is a "disabled person," which is defined as follows:

" 'Disabled person' means a person *** who (a) because of mental deterioration or physical incapacity is not fully able to manage his person or estate, or (b) is mentally ill or developmentally disabled and who because of his mental illness or developmental disability is not fully able to manage his person or estate ***." (755 ILCS 5/11a—2 (West 1992).)

This definition bears substantial similarity to the requirement of section 2—107.1 that the mental health recipient suffer from a "serious mental illness or developmental disability" and that the recipient "lacks the capacity to make a reasoned decision about the [administration of psychotropic] medication." (405 ILCS 5/2—107.1(d)(2), (d)(5) (West 1992).) We also find it noteworthy that the Probate Act provides for the appointment of a limited or temporary guardian, thus providing the ward with the aid and protection of a guardian "upon a showing of the necessity therefor for the welfare and protection of the disabled person *** on such notice and subject to such conditions as the court may prescribe." (755 ILCS 5/11a—4 (West 1992) (appointment of temporary guardian).) Such appointment must be used "only as is necessary to promote the well-being of the disabled person, to protect him from neglect, exploitation, or abuse, and to encourage development of his maximum self-reliance and independence." (755 ILCS 5/11a—3(b) (West 1992).) Appointment of a guardian "shall be ordered only to the extent necessitated by the

individual's actual mental, physical and adaptive limitations." (755 ILCS 5/11a—3(b) (West 1992).) Such limited or temporary guardianship could include, where appropriate, the power to consent to the administration of psychotropic medication, provided the requirements of section 2—107.1 are satisfied. We cannot say that section 2—107.1 is unconstitutional for its failure to explicitly *require* such guardianship appointments in all instances.

For the reasons stated, we conclude that section 2—107.1 is not unconstitutional on its face. As a result, the judgment of the circuit court is reversed and the cause is remanded for further proceedings consistent herewith.

*Reversed and remanded.*