2022 IL App (1st) 220851

SIXTH DIVISION
August 4, 2022

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-22-0851

| | | |
|---|---|---|
| *In re* JOHN F., a Person Found Subject to Involuntary Electroconvulsive Therapy, | ) | |
| | ) | |
| | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | No. 22 CoMH 1728 |
| v. | ) | |
| | ) | Honorable |
| John F., | ) | Maureen Ward-Kirby, |
| | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justice Oden Johnson concurred in the judgment and opinion.
Justice Mitchell dissented, with opinion.

**OPINION**

¶ 1     This case is before the court on review of a petition seeking to administer involuntary electroconvulsive therapy (ECT) to John F., after what doctors and his wife testified was a sudden, but persistent, severe decline in his mental health. The trial court allowed the petition, and, for the following reasons, we affirm.

¶ 2                              I. BACKGROUND

¶ 3     On May 10, 2022, Dr. Brandon Hamm, John F.'s attending psychiatrist, filed a petition seeking the authority to administer involuntary mental health treatment—specifically,

electroconvulsive therapy (ECT)—to appellant John F. The petition was filed under section 2-107.1 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/2-107.1 (West 2020)). That statute, titled "Administration of psychotropic medication and electroconvulsive therapy upon application to a court," provides:

"(4) Psychotropic medication and electroconvulsive therapy may be administered to the recipient if and only if it has been determined by clear and convincing evidence that all of the following factors are present. In determining whether a person meets the criteria specified in the following paragraphs (A) through (G), the court may consider evidence of the person's history of serious violence, repeated past pattern of specific behavior, actions related to the person's illness, or past outcomes of various treatment options.

(A) That the recipient has a serious mental illness or developmental disability.

(B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the treatment outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

2

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2-107.1(a-5) (West 2020).

¶ 4 In the petition, Dr. Hamm sought authorization to administer both the unilateral and bilateral forms of ECT, up to three times per week, and other related tests and procedures. The petition included Dr. Hamm's explanation as to why he believed that John F. met the criteria for involuntary treatment under section 2-107.1.

¶ 5 A. The Hearing

¶ 6 A hearing was held before Judge Maureen Ward-Kirby on June 8, 2022. There, the State sought to amend the petition to increase the maximum frequency of ECT administration from three to five times per week. There was no objection, and that amendment was granted. The State presented testimony from Dr. Hamm, Dr. Danielle Anderson, who was stipulated to be an expert in psychiatry and administration of ECT, and John F's' wife. John F. presented no witnesses.

¶ 7 1. Dr. Brandon Hamm

¶ 8 Dr. Hamm testified that John F.'s most recent hospitalization began on March 15, 2022. He was admitted because "[h]e was in a bedridden state and unable to mobilize or eat, and his wife was concerned." He had also experienced substantial weight loss, about 50 pounds. Dr. Hamm examined John F. on March 16, and said that John F. was "very guarded," was "not very forthcoming," and was "further cachectic than the previous time I had seen him," with his collar bones protruding from his chest. Dr. Hamm defined "cachectic" as a "starvation state where the body's lost [its] reserves of fat and is breaking down [its] muscle, in order to provide energy to the

3

brain, and the heart, and all the organs. So as a kind of living decomposing kind of state."

¶ 9    Dr. Hamm said that he had evaluated John F. at least weekly since he had been admitted, sometimes daily, and explained that, in the hospital, John F.'s participation in physical and occupation therapy fluctuated, he declined treatment or evaluations for his constipation or his reported swallowing issues, and though he claimed to be eating and taking his medications, was observed disposing of his food and medications. Dr. Hamm also said that although John F. claimed he was not able to "ambulate," camera footage showed him walking around the room and disposing of his food without any apparent discomfort.

¶ 10    Dr. Hamm testified that he had reviewed John F.'s medical records, discussed John F.'s condition with several peers—including psychiatrists, psychologists, social workers, and nurses—and had spoken with John F.'s wife and daughter. It was Dr. Hamm's opinion that John F. suffered from a serious mental illness. Although he had "a[n] atypical presentation," Dr. Hamm's opinion at the time was that it was "most consistent with the category of delusional disorder." Because of the "fairly atypical time period" of the illness's onset, however, and the fact that Mr. F had "some vegetative symptoms," the "working diagnosis for most of [his] hospitalization" had been "psychotic disorder unspecified type."

¶ 11    Dr. Hamm said that John F. displayed suffering in that he said he was experiencing pain, "but it migrates in where it is reported," he reported difficulty eating and defecating, and had lost over 50 pounds because he was not eating. John F.'s failure to eat "also has lead [*sic*] to him being admitted to the intensive care unit for sodium abnormalities and constant hypoglycemia events. At that point, we were considering a feeding tube for medical emergency." Dr. Hamm said John F.'s symptoms were "fairly constant." John F. had, however, stopped hiding his pills because Dr. Hamm had told him that he could just decline the pills, which John F. started to do instead.

¶ 12    Dr. Hamm said John F. did not believe he had delusions, though the doctor also thought "at points [John F. has] entertained the idea that maybe there's something that's wrong that's influencing all this, but he's predominantly skeptical of that idea, and more fixated on the idea that there's something medically wrong with him, which is also very confusing since he does not consent to evaluations for the problems he's reporting." Dr. Hamm also said that John F. was "suffering greatly" because "[h]e feels hopeless about how much he feels like has to be improved for him to get back to a functional life." Dr. Hamm said that John F.'s behavior was "fully a result of delusions prompting action and choices."

¶ 13    As to whether John F.'s illness had caused deterioration in his ability to function, Dr. Hamm answered, "[y]es. Extremely. Extremely so. He was working. Seemed to be enjoying his life. Thriving in life. Had strong relationships with his family from what they report. And he has become isolated, bedridden, not able to work, or ambulate his [*sic*] home, or do anything that he's interested in life. It's extreme deterioration." John F.'s family reported that the onset of the mental illness had been sudden, not gradual.

¶ 14    Dr. Hamm said that, at the time of the hearing, ECT was the preferred treatment over medication for John F. because the side effects were not as harmful. He explained that many psychiatric medications induce constipation, and some can cause decreased sodium, both symptoms that John F. was already experiencing. Dr. Hamm also said that John F. "d[id] not consent to any psychiatric medications" at that time. Dr. Hamm said that one area where ECT is preferred over medication is for "geriatric mental illness," when a patient may be more sensitive to side effects or "may not be able to tolerate stronger medications."

¶ 15    Dr. Hamm hoped that ECT would de-escalate John F.'s delusions "to the point where he's less fixated on a perceived inability to do body functions, and eat, and defecate, and move, and

5

he's able to restrengthen with physical therapy, occupational therapy." Dr. Hamm also hoped that ECT would allow John F. to "regain an authentic relationship with his family," "to nourish himself sufficiently," and to consent to necessary medical evaluations.

¶ 16    According to Dr. Hamm, the most common side effect of ECT was headache and "temporary impairment in memory [wa]s [also] common." Dr. Hamm testified that delirium sometimes occurs, but that if it did here, the team would decrease the treatment frequency or consider discontinuation. Dr. Hamm also said, "[t]here is some kind of controversial reports of longer term memory issues, though, studies have demonstrated actually improved memory in the long term after ECT, rather than impaired memory."

¶ 17    Dr. Hamm testified that the benefits of ECT "far outweigh[ed] the risks" for John F.: "This man is on death's door. If he weren't in our hospital, *** he would have died by now. And this is an attempt to give him back some functionality and of [*sic*] life back."

¶ 18    Dr. Hamm gave John F. written information about the risks and benefits of ECT on April 7, 2022, and John F. "was cautious about it," was "intimidated by the idea of [ECT]," and did "have concerns about memory impairment." Dr. Hamm said that John F. "has some insight that there's something wrong" with him but "he does not have insight that he has a delusion disorder, or that ECT is indicated for his mental health issues." As to whether John F. was able to evaluate the advantages or disadvantages of ECT, Dr. Hamm explained that John F. "would be able to talk back what you say to him. He's able to read information and acknowledge there are risks to ECT." Dr. Hamm explained that although "John F. [did] have a consistent choice that he does not want ECT," he was not able to appreciate the advantages and disadvantages of treatment: "is [he] able to appreciate that there is a reason that he needs ECT? No. Does he appreciate that there [are] delusions, and delusions require psychiatric intervention? No." Dr. Hamm did not believe that

John F. had the capacity to make a reasoned judgment about ECT.

¶ 19    Dr. Hamm testified that psychiatric medications were offered during the hospitalization that began on March 15, and further that when John F. accepted the medications, the doctor believed he had the capacity to accept psychiatric medication. However, the medications were then stopped because they "[d]idn't work." Duloxetine was stopped because it "didn't improve any apathy or social interaction aspects." And Risperidone, Olanzapine, and Aripiprazole did not change John F.'s "obsessional, somatic delusions." None of the drugs deescalated the delusions in a way that allowed John F. to regain independence. Dr. Hamm also considered the medications to be a failure because of the side effects John F. had experienced. Dr. Hamm believed John F.'s team had "done a very thorough job" of exploring less restrictive treatment options before recommending ECT. The last time Dr. Hamm had offered John F. medications was, according to medical records, on April 30, 2022. As Dr. Hamm explained in his testimony, the medications were not being given involuntarily and John F. was entitled to decline, and at that time John F. said he did not want to take the medications anymore.

¶ 20    As to John F.'s capacity as of April 30, 2022, Dr. Hamm testified:

> "I became more aware of his evasive behavior with the food at that time, and I actually didn't realize that he could ambulate. And so the, I guess, the efforts to which he was going to avoid nutrition and medications were more transparent at that time. The *** oddness of his decision[-]making process and how it seemed to be very driven by delusional content was much clearer."

¶ 21    Dr. Hamm said John F.'s prognosis without ECT "would be grim, and I would expect death within six months. *** if he were to leave the hospital now, he probably dies within three months." John F. did not have a power of attorney for healthcare or a declaration for mental health treatment.

¶ 22    Dr. Hamm testified that he also treated John F. during a previous admission in January 2022 and "the issues were similar," though John F. "was less cachectic and had lost less weight at that time." Dr. Hamm testified that in January 2022:

> "[ECT] was proposed to [John F.] as a potential treatment option, and he declined at that time. Started participating a little bit more with physical therapy, occupational therapy. He seemed to be eating more. And so the thing at that time was to try and give him a chance to, you know, thrive more independently. And we did not pursue involuntary [ECT] at that time."

¶ 23    On cross-examination, Dr. Hamm agreed that he did present the information on ECT to John F. in January, John F. declined the treatment, and Dr. Hamm respected those wishes at that time. When asked whether Dr. Hamm believed John F. had the capacity to make that judgment at the time, he said, "I felt that he deserved the least evasive [*sic*] means attempt at treatment in the setting of declining the intervention." Dr. Hamm offered John F. medications at that time, John F. said he was willing to take the medications, and Dr. Hamm agreed that he judged John F. to have the "capacity to make a reasoned psychiatric decision regarding medication at that time."

¶ 24    Dr. Hamm acknowledged that during John F.'s admission in January 2022, John F. said he did not want ECT because "he was intimidated by potential for memory impairment. Dr. Hamm agreed that temporary memory impairment was a potential side effect of ECT and that John F.'s concern was not delusional, but a legitimate concern. He also acknowledged that John F.'s stated reason for declining ECT during his most recent admission was based on the same concern about memory loss.

¶ 25                              2. Dr. Danielle Anderson

¶ 26    Dr. Anderson testified that she was a member of the team at Northwestern that would

administer ECT to John F. if the petition was granted. She had reviewed John F.'s chart, consulted with Dr. Hamm, and met John F. twice. Dr. Anderson agreed with Dr. Hamm's recommendation of ECT to treat John F.

¶ 27    Dr. Anderson walked through the general procedure for administering ECT. She or one of the other doctors on the ECT team administers the treatments with a psychiatrist, an anesthesiologist, and at least two nurse anesthetists also present. Before receiving the treatment, John F. would be examined by the anesthesiologist and psychiatrist in the post-anesthesia care unit (PACU). He would be fitted with an electrocardiogram (EKG) and oxygen monitors, set up to be attached to an electroencephalogram (EEG), and adhesive pads would be placed on his forehead and behind his ears, along with conductive jelly between the pads and John F.'s scalp to reduce the risk of burns. John F. would then be taken into the ECT room, where he would be hooked up to the ECT machine, administered intravenous anesthesia, and given medication to temporarily paralyze his body. The ECT itself would involve giving John F. "electrical stimulants that will last about up to eight seconds," causing him to "have a seizure that lasts between twenty seconds and two minutes." If the seizure lasts longer than that, John F. would receive medication to stop the seizure. When the treatment is finished, John F. would be woken up and monitored for a period of time, then returned to the PACU for further recovery and monitoring by a nurse before returning to his unit. Dr. Anderson explained that "during the entire procedure they're checking— monitoring his oxygen saturation, his blood pressure, his pulse."

¶ 28    Dr. Anderson testified that her team was seeking authorization for both unilateral and bilateral ECT, for up to five treatments per week. She explained that although "[b]ilateral ECT is more effective," it is also associated with "more memory deficits." With unilateral ECT, only the non-dominant hemisphere of the brain is stimulated, decreasing the amount of memory loss. Dr.

Anderson said that both types of ECT were appropriate for John F. because "[h]e is extremely severe. So it allows for you to move from one to the other." The doctor explained that if her team started by administering bilateral ECT and there were too many memory deficits, they could switch to unilateral ECT. Conversely, they could start with unilateral ECT, and if John F. was still exhibiting too many symptoms, they could switch to bilateral ECT. Dr. Anderson said they were seeking 90 days because that was an appropriate amount of time to see if the treatment was working properly. Dr. Anderson also explained that although they had requested authorization for up to five ECT treatments per week, the likelihood of needing five treatments per week was "low." She said that they had treated at least 50 patients with ECT in the last six months and, of those patients, only "[a]bout two" needed ECT five times per week.

¶ 29    Dr. Anderson believed the benefits of ECT outweighed the harm, though she also acknowledged that "[t]here are a lot of side effects." She said the side effects of ECT included the patient possibly biting their tongue, but the team mitigates this risk by using a "bite block." There is also a risk of bone breaks or fractures, which is why the patient is paralyzed before the treatment. Dr. Anderson explained that John F. "had a lot of concern about whether or not he would have some damage to his spinal area" due to back problems. Because of this, Dr. Anderson said that for him they would use a specific medication "to make sure that he is completely paralyzed," and then use "a nerve stimulator to ensure that he will not move *** to decrease that risk. It does increase your heart rate and your pulse during the procedure. So there is a *** small risk of heart attack or stroke, and that's why we always check the EKG to make sure the person's heart function is doing well." Upon waking, the patient might also have nausea, or "some muscle aches or you might have headaches. You may have some heart arrhythmias, and usually that resolves by the time that procedure is over." Dr. Anderson said that medical professionals would be available if John F.

suffered from any of these side effects.

¶ 30    As to the benefits, Dr. Anderson said that ECT was "a good and mostly safe way to treat depression. And, especially, if you have a depression that has associated psychotic symptoms, it will work very effectively. It tends to work faster than our medication, as well." Dr. Anderson believed that ECT was the best treatment for John F. because they had "already been struggling for quite a while with trying to get treatment for him," and John F. had "failed multiple trials of medications." Dr. Anderson said that John F.'s delusions were "getting in the way" and he had not been compliant in taking his prescribed medications. With ECT, Dr. Anderson and her team could be certain that John F. was getting the treatment he needed.

¶ 31    Dr. Anderson did not believe John F. had the requisite capacity to decide whether to agree to ECT as treatment, stating "[h]e doesn't have any appreciation for his illness."

¶ 32                                     3. Dianne F.

¶ 33    John F.'s wife, Dianne, testified that she and John F. had been married for almost 38 years. She said that "up until this time, he has been an amazing person. Very doting father on all of his kids. Very active in all their lives—our lives. Very hands on with everything." He was very active, ran three miles a day, had been involved in their kids' sports and activities, and had danced at their daughter's wedding the previous year. John F. had also been employed as a regional sales manager, "[s]o he was always talking. That was his personality." Dianne testified, "[t]hen this happened 360. This is totally not him. Not him at all."

¶ 34    Dianne said she started noticing changes in her husband in late August or September of 2021, but that the "major differences started in October." It began with paranoia, and then John F. began isolating himself from his family. They first brought him to a local hospital in November, but "nothing was done then." They then brought him to Northwestern in December, at which time

John F. was given medication and, although he had been refusing to eat, started to eat "a little bit" when he was threatened with a feeding tube. The doctors also wanted to do ECT at that time, but John F. refused.

¶ 35    Dianne said that John F. was discharged from the hospital with orders for mandatory therapy. He refused to go to therapy, however, and she and her son "practically dragged him to the car to take him there." Dianne then described how John F. attempted to open the car door on the highway, and when she duct-taped the door handle to prevent this, he tried to grab the steering wheel and drive the car off the road. John F. was prescribed medication at that time, and Dianne said they "couldn't figure out why he wasn't getting any better." When she recently got a new mattress, she "[f]ound all of these pills under the mattress ***. It was covered with pills. So he was taking them out of his mouth apparently and putting them under the mattress."

¶ 36    Dianne explained that they brought John F. to Northwestern for his most recent admission because "for four weeks straight he stayed in the bed [and] stared at the ceiling. No TV. No nothing. Refused to come out and eat. Just refused anything. And I finally said, you're not going to die in that bed. I'm taking you in." Dianne said that John F.'s weight the previous summer was 160 pounds, and at one point in the hospital he was 94 pounds.

¶ 37    On cross-examination, Dianne testified that she discussed ECT with John F. when he was admitted to the hospital in December, and he refused ECT at that time because "[h]e was afraid. He was afraid of it. He was told he would lose his memory for two weeks after [the treatment], and he wouldn't learn new things, and he was afraid of that." Dianne had most recently spoken to John F. about ECT the week before, and she said, "[h]e knew he was getting it" and "was fine knowing that he was getting it." Dianne believed her husband had resigned himself to "the fact that he had no choice in the matter." She agreed, however, that he did not waver in his refusal of

the ECT during his December to January hospitalization.

¶ 38                              B. Closing Arguments and the Court's Ruling

¶ 39    In closing argument, counsel for John F. argued that the State had "failed to meet its burden of proof with regard to capacity," and that John F. had "made his wishes clear in January and December of last year," a consideration under the doctrine of substituted judgment. Counsel pointed out that John F. had declined ECT "at a time when Dr. Hamm deemed him to have capacity," that both Dr. Hamm and Dianne testified that John F. had not wavered from that decision, and that Dr. Hamm had said John F.'s concern about memory loss was reasonable. Counsel argued, "my client made a reasonable medical decision based on the information that was provided to him, and at a time when the doctor who testified today deemed him to have capacity, he denied ECT treatment."

¶ 40    The State argued that "capacity does fluctuate," and that "the ability for a [r]espondent to consistently parrot back a concern does not equal capacity." The State pointed out that John F.'s present lack of capacity—as testified to by Drs. Anderson and Hamm—was uncontroverted.

¶ 41    Counsel for John F. argued in rebuttal that "[t]he testimony regarding [his] client's capacity between December and January [was] also uncontroverted. Dr. Hamm said he had capacity at that time." Under the substituted judgment doctrine, counsel argued, "the Court is supposed to respect the wishes of a person when [he or she] had capacity or competency" when those wishes were made known.

¶ 42    The court stated, "with respect to capacity, this is a nuanced case, and I have to look at the different points in time. And so what I'm going to focus on here is the April 30th time frame, because that's specifically where I had testimony from Dr. Hamm saying basically he recognized that there wasn't capacity then." The court found John F. did not have capacity at the time of the

13

hearing based on Dr. Hamm's testimony as to John F.'s "evasive behavior" and that John F.'s decision-making "was driven by delusional behavior." The court said, "what the doctor testified to—both doctors—is that he cannot appreciate the reason why he needs the [ECT] because he's being blocked by his delusions. *** he can't appreciate that his condition [is] driven by the delusions [and] requires treatment." The court concluded, "I'm going based on the testimony that I have heard from the doctors. So that—that will be the basis of that decision with respect to capacity." The following exchange then occurred:

"[COUNSEL FOR JOHN F.]: Are you going to address the substitute judgment argument?

[THE COURT]: Well, at this point, I think that he has no capacity.

[COUNSEL FOR JOHN F.]: In January he had no capacity?

[THE COURT]: We're not talking about January because that was a petition that wasn't filed. I'm talking—right now this man has been in the hospital since mid-March.

[COUNSEL FOR JOHN F.]: I understand, but the case law states that when a person makes their wishes known and apparent that the Court is to respect the wishes. ***

In January, my client was competent and expressed his wishes. I—I believe his substitute judgment should be respected.

[THE COURT]: Well, at this point, I'm going to decline to do that just for—

***

[THE COURT]: —purposes of appeal. Because I'm looking at the time frame of when this petition was filed. Capacity does ebb and flow, as we know from many cases, and that's what sort of happened in this case."

¶ 43    The court then found the State had met its burden of proof by clear and convincing

evidence, and that John F. would receive involuntary ECT. The court found that John F. suffered from a mental illness, "namely, delusional disorder of an unspecified type. And as Dr. Hamm testified, he has a fixed false belief that's been present for more than a month, namely, you know, these somatic delusions that he can't eat, that he can't ambulate, that he can't swallow." The court observed, "[o]ut of nowhere this individual became bedridden seven months ago. He's apathetic. He's withdrawn, and he's just refusing to basically eat, walk, defecate." The court found the State had proven that John F. exhibited threatening behavior—based on Dr. Hamm's testimony that John F. would die without medical intervention; had experienced deterioration—when his ability to function prior to the current onset of symptoms was compared with his condition since October 2021; and that he was suffering—based on Dr. Hamm's testimony that John F. felt hopeless and was distressed by the impact of his condition on his relationships.

¶ 44    The court also found that John F.'s illness "ha[d] existed for a period of time marked by the continuing presence of his symptoms" and that the benefits of treatment outweighed the harm. The court found that John F. had been advised in writing of the benefits and side effects of, as well as the alternatives to ECT, but he "lack[ed] the capacity to make a reasoned decision about the treatment for the reasons previously discussed," and that "less restrictive services [had been] explored and found inappropriate." Finally, the court found a good faith effort was made to find out whether John F. had a power of attorney for healthcare or a declaration for mental health treatment, and neither was found to exist.

¶ 45    On the same day, June 8, 2022, the trial court also entered a form written order, noting by checkmarks that each of these criteria had been met. The court granted the petition, authorizing involuntary ECT treatments for John F., both bilateral and unilateral, up to five times per week for a maximum of 30 treatments, along with the related tests and procedures.

¶ 46                      C. Post-Judgment Trial Court Proceedings

¶ 47    On June 9, 2022, John F. filed both a notice of appeal and an emergency motion for a stay pending that appeal.

¶ 48    A hearing on the motion to stay was held before Judge Alfred Paul on June 15, 2022. In addition to counsel for the State and counsel for John F., counsel for Dr. Hamm and Northwestern filed an appearance and was also present for the first time in the proceedings.

¶ 49    John F.'s argument in support of the stay centered on the trial court's failure to consider the substituted judgment doctrine and the fact that the appeal would be mooted if the stay was not granted. The trial court denied the stay.

¶ 50                         D. Appellate Proceedings

¶ 51    On June 16, 2022, John F. filed a motion to stay enforcement of the trial court's judgment pending appeal in this court, and we granted that motion on June 17, 2022. We also set an expedited briefing schedule for the case.

¶ 52    On June 27, 2022, this court granted what was labeled a joint motion to strike the appearance filed by counsel on behalf of Dr. Hamm and Northwestern. Through counsel, Dr. Hamm and Northwestern filed a motion to reconsider that order, arguing they were denied their right to respond to the motion to strike and that they were entitled to be parties to this case pursuant to the Mental Health Code (see 405 ILCS 5/3-101(b) (West 2020)). We denied the motion to reconsider on July 13, 2022, but allowed the doctor and the hospital to file an *amicus* brief, which they did on July 21, 2022.

¶ 53    Dr. Hamm and Northwestern then filed a motion for a supervisory order from the Illinois Supreme Court, asking that court to vacate our orders of June 27 and July 13, 2022. After reviewing a courtesy copy of that supervisory order, we were persuaded by the argument. On July 27, 2022,

on our own motion, we vacated our orders of June 27 and July 13, 2022, reinstated the appearances of Dr. Hamm and Northwestern as appellees, and said we would treat their *amicus* brief as an appellee response brief. John F. has since filed a motion for a supervisory order requiring us to vacate our July 27, 2022, order.

¶ 54                                    II. JURISDICTION

¶ 55    John F. timely filed his notice of appeal from the circuit court's grant of the petition on June 9, 2022. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 56                                    III. ANALYSIS

¶ 57    John F. asks us to reverse the order of the trial court because that court refused to consider evidence which showed that at a time when he had capacity to make decisions about his mental health treatment, he expressly declined to consent to ECT. According to John F. and to the *amici curiae* that this court allowed to file a brief in support of John F.—including the American Civil Liberties Union of Illinois, the Connecticut Legal Rights Project, Equip for Equality, the National Association for Rights Protection and Advocacy, and New York Lawyers for Public Interest—the doctrine of "substituted judgment" is a required part of the analysis under section 2-107.1 of the Mental Health Code.

¶ 58    Appellees—the State, Dr. Hamm, and Northwestern—respond that "substituted judgment" is not a required part of the analysis; rather, the court only needs to look to the specific statutory requirements listed in section 2-107.1. Appellees further argue that even if substituted judgment were part of the analysis, there was no clear showing that John F. had capacity to decline ECT at any specific point in time and that such a showing is a prerequisite to the trial court considering

17

substituted judgment. In addition, appellees contend that John F.'s declination of ECT when John F. claims he had capacity to make such a decision did not extend to the circumstances that were before the trial court at the time the petition was granted.

¶ 59    The parties disagree about our standard of review. Dr. Hamm and Northwestern argue we must affirm unless the trial court's factual findings that the statutory requirements were met were against the manifest weight of the evidence. The State argues we must affirm unless the trial court abused its discretion. John F. argues that we are presented with a legal error by the trial court because it was required and refused to consider the "substituted judgment" criteria.

¶ 60    In our view, it is appropriate to begin with the legal question of the role of substituted judgment in ordering mental health treatment under section 2-107.1. We agree with John F. that this is a legal issue that we consider *de novo*. *In re Clinton S.*, 2016 IL App (2d) 151138, ¶ 21.

¶ 61    John F. claims that express consideration of the substituted judgment criteria is required under section 2-107.1 of the Mental Health Code. Appellees respond that consideration of both the best-interests test and the substituted-judgment test have been replaced by the specific requirements of section 2-107.1, and that a substituted judgment can be disregarded when making the factual findings required under that section. We think both arguments slightly miss the mark.

¶ 62    As all the parties recognize, our determination of this legal issue is guided by our supreme court's decision in *In re C.E.*, 161 Ill. 2d 200 (1994). There, the respondent's father and guardian filed a petition for a declaration that section 2-107.1 was unconstitutional. *Id.* at 206. The argument made was that the statute unconstitutionally invaded a patient's liberty interests because it did not require application of the substituted-judgment test. *Id.* at 219-20. The court found section 2-107.1 was constitutional. *Id.* at 233. In doing so, our supreme court considered the role of "substituted judgment"—as it had been defined in previous supreme court cases—in petitions filed under

section 2-107.1 of the Mental Health Code.

¶ 63    The "substituted judgment" test was endorsed by our supreme court in *In re Estate of Longeway*, 133 Ill. 2d 33, 49 (1989). There, the issue before the court was the power of a guardian to refuse artificial nutrition and hydration on behalf of his ward. *Id.* at 37. The court found the substituted judgment standard to be the appropriate approach. *Id.* at 49-51. In doing so, the court noted that other courts had applied a "best interests" analysis to similar situations. *Id.* at 48. However, the court rejected the best interests analysis in the situation before it because "the record demonstrate[d] the relevancy of the substituted-judgment theory," and because the substituted judgment doctrine appeared to have been "implicitly adopted" by the legislature in the Powers of Attorney for Health Care Law. *Id.* at 49 (citing Ill. Rev. Stat. 1987, ch. 110 ½ par. 804-10).

¶ 64    As the court articulated this approach in *Longeway*, "[u]nder substituted judgment, a surrogate decisionmaker attempts to establish, with as much accuracy as possible, what decision the patient would make if he were competent to do so." *Id.* This should begin with a determination of whether "the patient had expressed explicit intent regarding this type of medical treatment." *Id.* Where there is no evidence of such an expression of intent, "the patient's personal value system must guide the surrogate." *Id.*

¶ 65    After *Longeway*, in *In re Estate of Greenspan*, 137 Ill. 2d 1, 18 (1990), our supreme court again considered the interaction between the best-interests test and the substituted-judgment theory, as those frameworks applied to "deciding whether to discontinue an incompetent and terminally ill patient's artificial life support." The *Greenspan* court explained that if it was "clearly and convincingly shown" that the incompetent person would wish to have artificial nutrition and hydration withdrawn, that person's "imputed choice cannot be governed by a determination of best interests by the public guardian *** or anyone else." *Id.* at 18. The court continued:

"Otherwise, the substituted-judgment procedure would be vitiated by a best-interests guardianship standard, elevating other parties' assessments of the meaning and value of life—or, at least, their assessments of what a reasonable individual would choose—over the affected individual's own common law right to refuse medical treatment. Accordingly, the public guardian is not prevented by a best-interests standard from seeking relief in according with [the incompetent person]'s wishes as determined by substituted-judgment procedure." *Id.*

¶ 66    The supreme court in *C.E.* acknowledged this reasoning from *Greenspan* in considering how the substituted judgment doctrine relates to the requirements of section 2-107.1. *C.E.*, 161 Ill. 2d at 222-24. The court, however, stopped short of saying that application of the doctrine was always required. *Id.* Rather, the court held:

"[W]e conclude that a mental health recipient's wishes, when competent, will often be very relevant to a determination of whether psychotropic substances should be administered under section 2–107.1. In those instances where there is no proof of the mental health recipient's views when the recipient was competent, the court should be guided by the best interests of the patient." *Id.* at 223-24.

Simply put, the fact that substituted judgment "will often be very relevant," is not the same as "always required," and John F.'s argument that *C.E.* commands such a doctrinaire approach is not supported.

¶ 67    On the other hand, the argument by Dr. Hamm and Northwestern that "the 'substituted judgment' standard must be disregarded in these proceedings" is, we think, contrary to the guidance of the supreme court in *C.E.* In *C.E.*, the supreme court specifically recognized the important liberty interest that patients have in refusing certain medical treatments, and that section

2-107.1 must be read in a way that protects that interest. *Id.* at 213-14, 217-24. As the supreme court noted:

> "Section 2–107.1 requires proof that the benefits of the psychotropic medication will outweigh its harms, and that other treatment alternatives have been considered and found ineffective. [Citation.] The wishes of the mental health recipient will often be highly pertinent to proof of these two factors." *Id.* at 220.

However, the court did not say, as appellees contend, that substituted judgment is *only* relevant to these two factors under the section 2-107.1 analysis.

¶ 68    Appellate decisions that have considered the interplay between *C.E.* and section 2-107.1 have concluded that "the supreme court has indicated that the trial court can consider the 'substituted judgment' of the patient and should, in fact, respect the competent wishes expressed by the mental health patient." *In re Israel*, 278 Ill. App. 3d 24, 34 (1996); see also *In re Denetra P.*, 382 Ill. App. 3d 538, 545 (2008) ("According to the supreme court's interpretation of section 2-107.1(a-5)(4) ([citation]), the trial court, if possible, must apply the substituted-judgment test before resorting to the best-interests test.") *In re Jones*, 285 Ill. App. 3d 8, 12 ("in the present case, our inquiry is whether [the respondent] clearly proved that her desire to refuse psychotropic medication was competently made").

¶ 69    We reject appellees' contention that we held otherwise in *In re Jennice L.*, 2021 IL App (1st) 200407. In *Jennice L.*, the court said that "it is the requirements of the Mental Health Code and not a 'best interest' standard that should guide a court's analysis with respect to a petition to involuntarily administer psychotropic medication and treatment." *Id.* ¶ 18. As the court recognized there, the far more general "best interest" inquiry has been replaced by specific statutory factors in section 2-107.1. Notably, the court in *Jennice L.* said nothing about substituted judgment. The

suggestion by Dr. Hamm and Northwestern in their brief that the court was referencing the "substituted judgment" doctrine when it rejected the circuit court's statement that it could not "substitute" its judgment for that of the doctor simply misreads the case.

¶ 70      In short, we agree with John F. that where there is evidence, especially through direct statements of the patient, made at a time that the patient was competent to make decisions, of the choice the patient would have made regarding the mental health treatment at issue, that evidence will generally be "very relevant" to the section 2-107.1 inquiry. *Id.* Thus, we must decide whether the trial court erred in its refusal to consider such evidence in this case.

¶ 71      As *C.E.* makes clear, evidence of the patient's choice is only relevant if expressed by the patient at a time when he or she had the capacity to make that choice. *C.E.*, 161 Ill. 2d at 223-24 ("the recipient's wishes, when competent, will often be very relevant"). The parties disagree as to whether the evidence in this case sufficiently demonstrates that John F. had this capacity when he told Dr. Hamm in January 2022 that he did not want ECT and explained his concerns about memory loss. John F. is correct that Dr. Hamm testified that, when John F. said he was willing to take medications in January, the doctor had believed John F. had the capacity to make "a reasoned psychiatric decision" regarding psychiatric medications. John F. points out that Dr. Hamm also agreed that even during his most recent hospital admission, and up until April 30, John F. had capacity to make decisions regarding medication. Appellees contend that John F.'s argument that Dr. Hamm believed that John F. had capacity is undermined by the fact that it centered on medication, not ECT, that Dr. Hamm had limited interaction with John F. in January 2022, and that Dr. Hamm did not know about the extent of John F.'s self -harming behavior.

¶ 72      We need not decide whether the evidence presented was sufficient to demonstrate that John F. had capacity in January, or where the burden on that issue should lie, since even if John F. had

capacity when he expressed his views and choices at that time, the facts had changed in significant ways by the time the petition was filed on May 10, 2022. As Dr. Hamm testified, in January 2022, John F. agreed to take medications, had seemingly started to eat more, and had started to participate more in physical and occupational therapy. The doctor said, at that time, he wanted to give John F. the chance to use less invasive options. By April 30, 2022, however, Dr. Hamm had learned that John F. was hiding his medications, throwing away his food, and saying he was unable to move despite evidence to the contrary, that his participation with occupational and physical therapy "fluctuated," and that his health had significantly deteriorated. Both doctors also testified that the attempts to medicate John F. had failed due to their ineffectiveness and the side effects, as well as his refusal to take medications. Thus, as of April 30, the time that Dr. Hamm testified that John F lacked capacity, other options had been tried and had failed. John F.'s refusal of ECT in January when other options such as physical therapy and medication remained viable does not equate with a refusal of ECT when all other options had failed. Thus, the court simply did not have the relevant evidence with which to apply the substituted-judgment test.

¶ 73    This analysis also addresses John F.'s due process argument. We agree with John F. and with the dissent that the guidance from our supreme court in *C.E.* and the due process concerns addressed there require that a trial court consider a patient's wishes that were expressed at a time of capacity, where they are relevant to the involuntary treatment that is being sought. But in this case, there was no evidence before the court that John F., at a time he had capacity, expressed the view that he would refuse ECT if it were the only option.

¶ 74    Because we have rejected John F.'s argument that the trial court's failure to expressly consider substituted judgment requires that we reverse, we affirm. John F. makes no argument that any of the court's carefully made factual findings were against the manifest weight of the evidence.

We have reviewed those findings ourselves and find them to be fully supported by the testimony at the hearing. Nor has John F. suggested any way in which the court abused its discretion other than in its purported disregard of his expressed wishes. We have considered and rejected that argument.

¶ 75                                    IV. CONCLUSION

¶ 76    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 77    Affirmed.


¶ 78    JUSTICE MITCHELL, dissenting:

¶ 79    Can a circuit court order a mentally ill patient to undergo upward of 30 sessions of involuntary electroconvulsive therapy *without* considering the patient's wish to decline such treatment expressed when he was allowed to make his own medical decisions? Because I believe the answer to this narrow legal question is "No," I respectfully dissent.

¶ 80    When ordering the electroconvulsive treatment under section 2-107.1 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/2-107.1 (West 2020)), the circuit court expressly limited its analysis to the recent period when John F. lacked capacity:

> "[THE COURT:] *** [w]hat I'm going to focus on here is the April 30th time frame, because that's specifically where I had testimony *** that there wasn't capacity then.
>
> * * *
>
> *** We're not talking about January because that was a petition wasn't filed."

¶ 81    Thus, the circuit court did not consider that just months earlier in January 2022, John declined electroconvulsive therapy. At that time, John's treating psychiatrist provided John with written information about the risks, benefits, and alternatives to electroconvulsive therapy. John

24

discussed the proposed treatment and refused it: John did not want to risk memory impairment (a likely side effect). Further, when readmitted to the hospital in March 2022, John's psychiatrist again proposed electroconvulsive therapy. Again, John refused, citing concerns over memory loss. These facts are undisputed.

¶ 82    Does what John had to say about electroconvulsive therapy when he was making earlier medical decisions have any relevance now when evaluating the State's petition for involuntary treatment? Our supreme court answered that question in Justice McMorrow's opinion for a unanimous court in *In re C.E.*, 161 Ill. 2d 200, 219 (1994). There, the court upheld section 2-107.1 in the face of a challenge that it was unconstitutional because the provision did not specifically require application of the "substituted judgment" analysis. *Id.* at 223-24. The court reasoned that the statute implicitly allowed for consideration of the patient's wishes expressed while competent:

> "Section 2-107.1 requires proof that the benefits of the psychotropic medication will outweigh its harms, and that other treatment alternatives have been considered and found ineffective. [Citation.] *The wishes of the mental health recipient will often be highly pertinent to proof of these two factors.*
>
> * * *
>
> [W]e conclude that section 2-107.1 permits the courts consideration of the 'substituted judgment' of the mental health recipient, and that *the court respect the wishes expressed by the mental health patient when the patient was capable of making rational treatment decisions in his own behalf.*" (Emphases added.) *Id.* at 220-21.[1]

---

[1]In its brief urging affirmance, Northwestern Hospital characterizes *C.E.* as "decided at a time when Section 2-107.1 was newly enacted" and based on a "now-discarded framework." It characterizes substituted judgment as a "vestigial" doctrine and questions if *C.E.* "remains good law." This remarkable effort to discount controlling precedent merely confirms the tension between the decision below and the analysis contemplated by *C.E.*

A prior published opinion of the Illinois Appellate Court has characterized the *C.E.* decision this way: "[T]he supreme court has indicated that the trial court can consider the 'substituted judgment' of the patient and should, in fact, respect the competent wishes expressed by the mental health patient." *People v. Israel*, 278 Ill. App. 3d 24, 34 (1996).

¶ 83    The majority excuses the circuit court's failure to consider John's refusal of electroconvulsive therapy in January and March because "facts had changed in significant ways" by April 30—he now lacked capacity and other treatments had failed. But patients subject to involuntary treatment under section 2-107.1 *always* lack capacity and *frequently* will have exhausted less coercive or intrusive treatment. Nothing in the law suggests that such a commonplace occurrence is a basis to turn a blind eye to the patient's previously expressed wishes.

¶ 84    When a patient declines a recommended treatment, his condition often will worsen. When the patient suffers from a mental illness, that worsening condition may well progress to a lack of capacity. That foreseeable consequence, however, should not create a basis to simply ignore the patient's earlier expressed wish to decline such treatment. Put another way, a patient's wish to decline treatment expressed while competent[2] is *always* relevant to the analysis set out in section 2-107.1 and informed by the supreme court's decision in *C.E.*

¶ 85    But even beyond the strictures of the Mental Health Code, American courts have long recognized that patients have a legal right to refuse medical intervention. See, *e.g.*, *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278 (1990) ("a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"); *Union Pacific*

---

[2]The State and Northwestern Hospital now question John's capacity in January when he first refused electroconvulsive therapy. What is clear from the record is that John's treating psychiatrist (at Northwestern Hospital) honored John's treatment wishes at that time, which certainly suggests that John had capacity to make medical decisions. But even still, any doubts about capacity would be another reason for a remand—not a basis to affirm. After all, the State bears the burden on its petition.

*Ry. v. Botsford*, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person"); *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129-30 (1914) (Cardozo, J.) ("Every human being of adult years and sound mind has a right to determine what shall be done with his body"); *Ficke v. Evangelical Health Systems*, 285 Ill. App. 3d 886, 889 (1996) ("As a general principle of Illinois law, competent adults have the right to refuse any type of medical care"). To simply declare a patient's expressed wishes "irrelevant" runs contrary to a century of jurisprudence related to informed consent, individual autonomy, and bodily integrity.

¶ 86    For all these reasons, I would reverse and remand for further proceedings.

_In re John F._, 2022 IL App (1st) 220851

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CoMH-1728; the Hon. Maureen Ward-Kirby, Judge presiding. |
| **Attorneys for Appellant:** | Veronique Baker, Director of the Legal Advocacy Service (Timothy R. Lea, Staff Attorney), of Hines, Illinois, for the respondent-appellant. |
| **Attorneys for Appellees:** | Kimberly M. Foxx, State's Attorney of Cook County (Enrique Abraham, Joseph Alexander, and David B. Greenspan, Assistant State's Attorneys, of counsel), of Chicago, for the People of the State of Illinois. |
| | Joseph T. Monahan, Monique C. Patton, John W. Whitcomb, and Joseph C.F. Willuweit, of Monahan Law Group, LLC, of Chicago, for Northwestern Memorial Hospital and Dr. Brandon Hamm. |
| **Attorneys for _Amici Curiae_:** | William V. Essig of Faegre Drinker Biddle & Reath LLP, of Chicago; John D. Winter and Kimberly A. Black, of Patterson Belknap Webb & Tyler LLP, of New York, New York, for _amici curiae_. |